IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT,
IN AND FOR SARASOTA COUNTY, FLORIDA
Civil Action

SARASOTA BAYSIDE, LLC; BRASFIELD
& GORRIE, LLC,

        Plaintiffs,

v.

ACE AMERICAN INSURANCE COMPANY;
XL INSURANCE AMERICA, INC.; OLD
REPUBLIC UNION INSURANCE
COMPANY,

        Defendants.

CASE NO.:

## <u>ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs, SARASOTA BAYSIDE, LLC ("Sarasota") and BRASFIELD & GORRIE, LLC ("B&G") (collectively, the "Insureds" or "Plaintiffs") by and through their respective attorneys, hereby sue Defendants ACE AMERICAN INSURANCE COMPANY ("ACE"), XL INSURANCE AMERICA, INC. ("XL"); and OLD REPUBLIC UNION INSURANCE COMPANY ("Old Republic") (collectively, "Defendants"):

1.    This action arises from Defendants' improper denial of the Insureds' insurance claim for direct physical loss and damage to property covered under a series of quota share builder's risk insurance policies.

2.    Such loss and damage include, without limitation, unintended impairment to the structural integrity of insured property, along with other fortuitous physical damage to foundations, precast garage structures, and Vibro Stone Columns as a result of covered perils, including but not limited to earth movement (the "Claim").

3.      Through this Complaint, the Insureds seek recovery of damages incurred as a consequence of Defendants' failure to pay insurance benefits owed in connection with the Claim, as well as declaratory relief for ongoing and accruing losses associated therewith same.

**PARTIES, JURISDICTION, AND VENUE**

4.      At all times material hereto, the Plaintiff, Sarasota Bayside, LLC was a foreign limited liability company, authorized to do business in Florida, and is otherwise sui juris.

5.      At all times material hereto, Brasfield & Gorrie, LLC was a foreign limited liability company, authorized to do business in Florida, and is otherwise sui juris.

6.      At all times material hereto, the Defendant, ACE American Insurance Company, a foreign corporation, was an insurance company authorized to do business in Florida, and transacting its customary business in Sarasota County, Florida, and is otherwise sui juris.

7.      At all times material hereto, the Defendant, XL Insurance America, Inc., a foreign corporation, was an insurance company authorized to do business in Florida, and transacting its customary business in Sarasota County, Florida, and is otherwise sui juris.

8.      At all times material hereto, the Defendant, Old Republic Union Insurance Company, a foreign corporation, was an insurance company authorized to do business in Florida, and transacting its customary business in Sarasota County, Florida, and is otherwise sui juris.

9.      Venue is proper in Sarasota County because the Claim arose in Sarasota County, the subject property and risk are located in Sarasota County, the present cause of action arose in Sarasota County, the Defendants transact their customary business in Sarasota County, and the Defendants have agents or other representatives in Sarasota County.

10.      All conditions precedent to this action have occurred, been performed, or have otherwise been waived.

## FACTUAL ALLEGATIONS

11.    Sarasota is the owner of a new construction project known as Sarasota Bayside, which is comprised of a concrete masonry 5-story apartment building with an internal (wrap) 4-story parking garage totaling 139,972 square feet, located at 800 Cocoanut Avenue, Sarasota, Florida 34236 (the "Project").

12.    Sarasota engaged B&G as general contractor for the Project pursuant to a December 22, 2023 Standard Form of Agreement Between Owner and Contractor (AIA A102-2017), and associated agreements.

13.    ACE, XL, and Old Republic are insurance carriers engaged in the business of insuring construction projects and providing (among other insurance products) builder's risk insurance policies to owners and general contractors, including to Sarasota and B&G in connection with the Project.

## THE POLICIES

14.    Prior to commencing the Project, Sarasota sought quotes for builder's risk insurance coverage through its insurance broker.

15.    Defendants provided quotes and, in reliance on the terms and representations presented through Defendants' and their quotes, Sarasota entered into a quota share insurance contract with Defendants, who then provided builder's risk policies bearing policy numbers I11218350 001 (ACE), US00141193CA24A (XL), and IM 0000976-00 (Old Republic) in consideration of premiums paid by Sarasota. See **Exhibit A** ("ACE Policy"), **Exhibit B** ("XL Policy"), and **Exhibit C** ("Old Republic Policy"), filed contemporaneously herewith (collectively, the "Policies").

16.     The ACE Policy serves as the lead policy form to which the XL Policy and Old Republic Policy follow form (meaning, the terms for all Policies are the same or substantially similar).

17.     The Policies' total limit of insurance is $127,030,296.

18.     ACE insures 50% of the total limit; XL insures 28% of the total limit; and Old Republic insures 22% of the total limit.

19.     Sarasota is the first named insured under the Policies.

20.     B&G is an insured under the Policies.

21.     Subject to the Policies' terms, Defendants are obligated to insure the Project against physical loss and damage.

**Part A: Insuring Agreement**

22.     The Policies' Part A, Insuring Agreement provides broad all-risk coverage for the Project pursuant to the following language:

> This Policy, subject to the terms, conditions and exclusions stated herein or endorsed hereto, insures against direct physical LOSS[1] to property of every kind and description intended to become a permanent part of, or be consumed in the construction, fabrication, assembly, installation, erection, or alteration of the INSURED PROJECT, as described on the Construction Risk Declarations and for which values have been declared and deposit premium paid. If not covered by other insurance and if values have been declared to the [Insurers] for deposit premium calculation, this Insuring Agreement shall also apply to TEMPORARY STRUCTURES.

**Earth Movement Coverage Extension**

23.     Beyond the broad insuring agreement set forth in Part A, the Policies also expressly extend coverage to LOSS caused by EARTH MOVEMENT where "a dollar value or 'Included'

---

[1] Terms denoted with all capital letters are assigned specific definitions as set forth in the Policies.

is stated in the applicable EARTH MOVEMENT Annual Aggregate Sub-limits of Insurance on the Construction Risk Declarations."

24.     The Policies at issue here clearly confer such EARTH MOVEMENT coverage up to full policy limits, as the applicable EARTH MOVEMENT Annual Aggregate Sub-limits of Insurance on the Construction Risk Declarations denotes "$127,030,296."

25.     The Policies define EARTH MOVEMENT as:

> All earthquake, landslide, mudslide, mudflow, rock fall, volcanic eruption, earth sinking (other than sinkhole collapse), rising, shifting, subsidence or other earth movement, whether observable or not observable, and whether man-made or caused by natural phenomena. EARTH MOVEMENT includes sea waves, tide or tidal waves, storm surge and spray caused by or resulting from tsunami or other tectonic or seismic activity.

26.     The Insureds' Claim for loss and damage to insured property falls squarely within the scope of the Policies' insuring agreement at Part A and/or the express coverage extension for EARTH MOVEMENT, and is not otherwise excluded by the Policies' terms and conditions.

**Delay in Opening Endorsement**

27.     In addition to the Policies' coverage for hard costs directly attributable to physical damage (including EARTH MOVEMENT), the Policies include a "Delay in Opening Endorsement" that expands Sarasota's coverage to include loss of rental income and soft costs/additional expenses sustained as a result of delay in completion of the Project.

28.     Specifically, the Policies state:

> Subject to all terms, conditions, limitations and exclusions of this Endorsement, and of the Policy to which it is attached, the Company will pay the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained during the PERIOD OF INDEMNITY as a result of a DELAY in completion of the INSURED PROJECT described on the Policy Declarations, or as amended by Endorsement, when such DELAY is caused by an OCCURRENCE or series of OCCURRENCE(S), resulting in physical LOSS to insured property by an insured peril.

The Company shall also indemnify the NAMED INSURED for extra expenses during the PERIOD OF INDEMNITY that are necessarily incurred for the purpose of reducing any loss amount under this endorsement, but only to the extent that such loss amount otherwise payable under this endorsement is thereby reduced.

29.    As a result of the physical damage giving rise to the Insureds' Claim, completion of the Project is presently anticipated to be delayed up to twelve (12) months, giving rise to significant additional losses to Sarasota, which are entitled to coverage under the Delay in Opening Endorsement and not otherwise excluded.

### Cost of Making Good Endorsement

30.    In addition, Sarasota paid additional premium to purchase an amended "Cost of Making Good" endorsement, which expands the scope of coverage to include loss and damage arising from defective work, design, and/or materials where direct physical LOSS by an insured peril (such as EARTH MOVEMENT) ensues. The endorsement is identified in the Policies as form number ACE0927 (03/22) 342474 (the "COMG Endorsement").

31.    Prior to procurement, Defendants quoted the Policies to include such COMG Endorsement and have materially represented that the coverage provided by the COMG Endorsement includes the cost of repairing defective work, design, and/or material, as well as the cost of repairing loss resulting from such defective work, design, and/or material where direct physical LOSS from an insured peril ensues.

32.    Defendants charged additional premium for the COMG Endorsement and added a $250,000 deductible for the additional coverage afforded by the COMG Endorsement.

33.    Sarasota relied on the Insurers' material representations in purchasing the COMG Endorsement and entering into the insurance contract.

34.    The COMG Endorsement is both an extension to the Policies' coverage grant and a limited exclusion.

35.     The COMG Endorsement starts by deleting the exclusions set forth in Policy form ACE0728 (11/21), Part D Exclusions, Excluded Causes of Loss, subpart. III, which would have otherwise barred coverage for the cost that would have been incurred to rectify "fault, defect, error, deficiency, or omission in design, plans, specifications, engineering or surveying," and "[f]aulty or defective workmanship, supplies, or materials" had such rectification been effected immediately prior to the LOSS.

36.     The COMG Endorsement then reinstates such coverage where direct physical LOSS by an insured peril ensues, subject to a limited exception for project improvements.

37.     Specifically, the COMG Endorsement states:

This Policy does not insure the costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the LOSS:

      A. Fault, defect, error, deficiency or omission in design, plans, specifications, engineering or surveying;

      B. Faulty or defective workmanship, supplies or material;

***However, if direct physical LOSS by an insured peril ensues, then this Policy will provide cover for such ensuing LOSS to insured property, including the damaged insured property that was faulty or defective.*** However, under no circumstances will this policy cover the costs to improve or redesign the original design, plans, specifications, engineering, surveying, workmanship, supplies or material.

For the purpose of this Policy and not merely this Excluded Cause of LOSS, insured property, or any portion thereof, shall not be regarded as damaged solely by virtue of the existence of any condition stated under A. or B. above.

(Emphasis added.)

38.     In sum, the COMG Endorsement grants coverage for loss and damage associated with allegedly defective design, work, and/or materials when direct physical LOSS by an insured peril (such as EARTH MOVEMENT) ensues, in which case the *only* excluded element is the cost to improve the original work, design, or materials.

39.     In addition, the COMG Endorsement clarifies that coverage is not triggered solely by the existence of a defect of material, workmanship, design, plan, or specification.

40.     The Insureds' Claim, as outlined in greater detail in the paragraphs below, does *not* seek costs to improve the Project's original work, design, and/or materials, *nor* does it seek coverage merely based on the existence of a defect.

41.     As such, the Insureds' Claim does not fall within the limited scope of the COMG Endorsement's exclusionary terms.

### Other Coverage Extensions

42.     The Policies provide various other coverage extensions implicated by the subject Claim, including, without limitation, extra expenses, expediting expenses, architects and engineers fees, claim preparation fees, and losses resulting from named windstorm.

### THE CLAIM

43.     The Insureds' Claim arose when they first identified physical damage by way of structural impairment and cracking to the Project's concrete precast parking garage, among other manifestations of damage.

44.     Construction of the Project's concrete precast parking garage began on or about August 30, 2024.

45.     Installation and construction appeared to proceed normally and in line with required design specifications and plans.

46.     On or about October 2, 2024, following an examination of the Project's concrete precast parking garage, the Insureds discovered that, in the mere four weeks since installation began, portions of the garage experienced sudden differential settlement from

approximately three to five inches. Within days we promptly notified the carriers to start a claim on October 4, 2024.

47.    The rapid differential settlement was caused by unanticipated and unexpected EARTH MOVEMENT and other fortuitous environmental factors.

48.    As a result, the Project suffered physical loss and damage to insured property in several ways, including, without limitation: (1) cracking, (2) impaired/reduced structural integrity; and (3) other fortuitus damage to foundations, the precast garage, and the support structures.

49.    Due to the EARTH MOVEMENT, the portions of the garage which had been constructed needed to be deconstructed and/or demolished to facilitate further repair efforts.

50.    The hard costs associated with these repair efforts are presently estimated to exceed $19,766,766.

51.    In addition, the Project is now significantly delayed, resulting in further damages including, without limitation, loss of rental income, soft costs, and additional expenses presently estimated at $12,902,672.

## DEFENDANTS' PROTRACTED INVESTIGATION AND ERRONEOUS COVERAGE DENIAL

52.    On October 9, 2024, the Insureds tendered the Claim to Defendants, requesting coverage under the Policies.

53.    In response to the tender, Defendants were obligated to conduct a prompt and thorough investigation of the Claim.

54.    Defendants purported to undertake these obligations under a reservation of rights; yet, despite the obvious geotechnical nature of the Claim, Defendants failed to

engage a geotechnical consultant until January 2025, thereby causing significant and
unnecessary delay in the investigation and adjustment of the Claim.

54. Further, upon information and belief, Defendants initially retained a
consultant(s), who generated opinions that were not supportive to Defendants' pending
coverage disclaimer; incidentally, Defendants elected not to proceed with that consultant(s)
and instead retained a new consultant months into the Claim process to produce new and
potentially differing investigative opinions regarding the Claim.

56. Defendants' ultimate investigative report contained inaccuracies regarding
the facts giving rise to the Claim the designated cause of loss and nature/scope of the
resultant damage claimed by the Insureds.

57. Defendants relied on this report as a basis for their coverage position, which
resulted in a wrongful disclaimer of benefits under the Policies.

58. Defendants provided a copy of this geotechnical report to the Insureds on
April 7, 2025 after repeated requests for same (though the report reflects a date of March
31, 2025).

59. On April 14, 2025 and April 16, 2025, B&G and Sarasota promptly issued
letters to Defendants advising them of the report's rampant inaccuracies and advising that
a more detailed summary of such errors was also forthcoming.

60. On April 24, 2025, Defendants' geotechnical consultant issued a
correspondence to ACE acknowledging the factual clarifications outlined by the Insureds
and requesting further information to continue his investigation of the Claim.

61. That same day, ACE proceeded to issue a coverage position letter denying
the Claim in full, despite its own consultant's expressed need for additional information to

adequately evaluate the Claim, and in disregard of its own knowledge that the Insureds
were in the process of preparing a more detailed summary of the report's inaccurate factual
findings and false conclusions.

62.    The next day (April 25, 2025), Sarasota sent Defendants that more detailed
summary of inaccuracies.

63.    Yet, again, Defendants ignored the supplemental facts submitted in support
of the Insureds' Claim and issued another coverage position letter (also on April 25, 2025).

64.    The second coverage disclaimer reiterated the total Claim denial but, this
time, it was issued on behalf of all Defendants (not just ACE).

65.    Defendants' wrongful Claim denial is based on erroneous insurance policy
interpretations and facts known by Defendants (and their consultants) to be inaccurate.

66.    As a direct and foreseeable consequence of Defendants' unreasonable
refusal to provide coverage to the Insureds in accordance with the Policies' terms, the
Insureds have and will continue to suffer damages.

67.    As such, the Insureds assert the following claims for relief:

<u>**COUNT I**</u>
<u>**BREACH OF CONTRACT (Against All Defendants)**</u>

68.    The Insureds repeat and reallege the allegations of paragraphs 1 through 67
as though fully set forth herein.

69.    Defendants, in consideration of premiums paid by Sarasota, duly executed
and delivered the Policies – each an insurance contract under which Sarasota and B&G are
insureds entitled to the rights and benefits thereof.

70.    Sarasota and B&G provided timely and sufficient notice of the Claim.

71.     Sarasota and B&G are, and at all relevant times were, in compliance with all conditions precedent for coverage under the terms of the Policies.

72.     Defendants are obligated pursuant to the terms of their respective Policies to pay damages arising from the Claim.

73.     Despite demands, Defendants unreasonably refused and/or otherwise failed to pay the Insureds coverage benefits due and owing under the Policies' terms.

74.     Defendants' refusal and/or failure to pay coverage benefits due and owing to the Insureds constitutes a breach of the Policies.

75.     As a result of Defendants' refusal to provide coverage, the Insureds have suffered damages and will continue to suffer damages in the future in a sum presently estimated at $33,669,438 for loss associated with the Claim.

WHEREFORE, the Plaintiffs, Sarasota and B&G, demand judgment for any and all compensatory damages allowable by law against the Defendants, ACE, XL, and Old Republic, together with any and all pre and post-judgment interest and taxable costs allowable by law, attorneys' fees pursuant to Florida Statutes, including but not limited to, § 627.70152, and for any such further relief this Court deems just and proper.

## COUNT II
## DECLARATORY JUDGEMENT (Against All Defendants)

76.     The Insureds repeat and reallege the allegations of paragraphs 1 through 75 as though fully set forth herein.

77.     Chapter 86, *Florida Statutes*, governs declaratory actions and gives the circuit court jurisdiction to declare rights, status, and other equitable or legal relations whether or not further relief is or could be claimed.

78.     A dispute has arisen between the Insureds and Defendants regarding whether Defendants are obligated to pay benefits to the Insureds for losses associated with the Claim, which are ongoing and continue to accrue.

79.     There is a bona fide, actual present practical need for a declaration of Plaintiffs' rights and Defendants' obligations under the Policies.

80.     The declaration deals with a present ascertained or ascertainable state of facts or present controversy as to said state of facts.

81.     Rights of the Plaintiffs are dependent upon the facts and the law applicable to the facts.

82.     The Plaintiffs and Defendants have actual, present, adverse and antagonistic interests in the subject matter, either in fact or law.

83.     The declaration sought deals with a present, ascertainable state of facts and present controversy as to said state of facts; to wit: whether the Defendants are obligated to provide coverage for the Claim.

84.     The Plaintiffs seek a judicial determination that the Defendants are obligated to cover the Claim pursuant to the Policies and Florida law.

WHEREFORE, the Plaintiffs, Sarasota and B&G, respectfully request entry of judgment in their favor and against Defendants, ACE, XL, and Old Republic, declaring that Defendants are obligated to provide coverage for loss and damage associated with the Claim, including ongoing and accruing loss and damage, for an award of attorneys' fees pursuant to Florida Statutes, including but not limited to, §§ 627.70152 and/or 86.121, taxable costs, and for any such further relief this Court deems just and proper.

## **JURY DEMAND**

WHEREFORE, the Plaintiffs hereby demand a trial by jury for all claims herein for which a jury is permitted.

Respectfully submitted on this 8th day of August, 2025.

SAXE DOERNBERGER & VITA, P.C.


*/s/Jonathan W. Chambers*
Jonathan W. Chambers (Fla. Bar No. 105799)
Cheryl L. Kozdrey (*pro hac vice* pending)
999 Vanderbilt Beach Rd., Suite 603
Naples, Florida 34108
Tel: (239) 316-7244
jchambers@sdvlaw.com
ckozdrey@sdvlaw.com

*Attorneys for Plaintiff, Sarasota Bayside, LLC.*

BOYLE LEONARD ANDERSON, P.A.


*/s/ Mark A. Boyle*
Mark A. Boyle, Esq. (Fla. Bar No. 5886)
Boyle, Leonard & Anderson, P.A.
9111 W College Pointe Dr
Fort Myers, FL 33919-3379
Tel: (239) 337-1303
MBoyle@Insurance-counsel.com

*Attorneys for Plaintiff, Brasfield & Gorrie, LLC.*

# EXHIBIT A



07/30/2024

MARSH USA
1221 BRICKELL AVENUE SUITE 1550
MIAMI, FL 33131

**Attn:** Colin Cleary

**RE:**    **Insured Name:**    **Sarasota Bayside, LLC**
           **Policy No.:**       **I11218350 001**
           **Company:**          **ACE American Insurance Company**

Enclosed please find the original and copies of the captioned policy. Please check to see that everything is in order, and let us know if there are any discrepancies or if you have any questions. Attached to this policy is the U.S Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice to Policyholder.

Thank you for working with us on the placement of this risk. We appreciate your support and look forward to working with you in the future.

Regards,

Sarah Wigle

*Please be advised that we do not review Certificates of Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy. Accordingly, we request that you do not provide copies of certificates to us for review or for our records. Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24, Accord 27 or Accord 28 for Property and Inland Marine) only**. It is your responsibility to see that any Certificate provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificate is issued. **Any modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificate of Insurance ACORD or other is prohibited**. Certificates of Insurance are never recognized as endorsements or policy change requests. You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgagees and/or alteration of notice requirements for cancellation) is requested. In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.*

*One of the CHUBB Group of Insurance Companies*

# *Common Policy Declarations*

CHUBB®

Policy Number: I11218350 001
Named Insured & Mailing Address:
**Sarasota Bayside, LLC**
**121 Alhambra Plaza PH1**
**Coral Gables, FL 33134**

Company Name: ACE American Insurance Company
Producer's Name & Address:
**MARSH USA**
**1221 BRICKELL AVENUE SUITE 1550**
**MIAMI, FL 33131**
**Z15417  -  New**

| General Policy Information | Business Description: | **Owner of completed structure** | |
|---|---|---|---|
| | When Coverage Begins: | **06/17/2024** | 12:01 A.M. Local Time at Named Insured's Address |
| | When Coverage Ends: | **05/17/2026** | 12:01 A.M. Local Time at Named Insured's Address |

**In return for the payment of premium, and subject to all the terms and conditions of this policy, we agree to provide the insurance as stated in this policy.**

The premium for this policy is indicated below next to the applicable Coverage Form(s).

*Coverage Form*

| | |
|---|---|
| **Construction Risk Coverage Form ACE0728 (11/21)** | $ ▢ |
| **TRIPRA** | $ ▢ |
| **2023 Florida Emergency Assessment Surcharge** | $ ▢ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| **Total Premium:** | $ ▢ |
| **Total Assessments, Fees, Surcharges, Taxes:** | $ ▢ |
| **Total Amount Due:** | $ ▢ |
| **Minimum Earned Premium:** | $ ▢ |

**Attached Forms Information**

See Forms Schedule CPfs2

**Authorization Information**

Date: 07/30/2024

JOHN J. LUPICA, President
Authorized Representative

**These Declarations together with the Coverage Declarations, Common Policy Conditions and Coverage Conditions (if applicable), Coverage Form(s) and Forms and Endorsements, if any, issued to form a part thereof, complete the above numbered policy.**

BB-5W58a (09/11)

©Chubb. 2016. All rights reserved.

Page 1 of 1

# *Forms Schedule*

**Company:** ACE American Insurance Company
**SYM:** **IMC**                    Policy ID: **I11218350 001**

| Policy Period | When Coverage Begins: | **06/17/2024** | 12:01 A.M. Local Time At Named Insured's Address |
|---|---|---|---|
| | When Coverage Ends: | **05/17/2026** | 12:01 A.M. Local Time At Named Insured's Address |

| | |
|---|---|
| **Applicable to all Coverage Parts** | Form No. and Description<br>**BB-5W58a (09/11)-Common Policy Declarations**<br>**ALL-21101 (11/06)-Trade or Economic Sanctions Endorsement**<br>**IL 09 52 (01/15)-Cap on Losses From Certified Acts Of Terrorism**<br>**TR-45231a (08/20)-Policyholder Disclosure Notice Of Terrorism Insurance Coverage**<br>**ALL-20887 (10/06)-CHUBB Producer Compensation Practices & Policies**<br>**ALL-5X45 (11/96)-Questions About Your Insurance**<br>**IL P 001 (01/04)-U.S. Treasury Departments' Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders**<br>**CC-1k11k (04/22)-Signatures** |
| **Commercial Inland Marine** | Form No. and Description<br>**ACE0727 (11/21)-Construction Risk Declarations**<br>**ACE0728 (11/21)-Construction Risk Coverage Form**<br>**ACE0210 (01/08)-Nuclear, Biological, Chemical, Radiological Exclusion**<br>**ACE0729 (11/21)-Delay In Opening Endorsement**<br>**ACE0769 (10/15)-Ordinance Or Law Coverage Endorsement**<br>**ACE0927 (03/22)-Amendment To Excluded Causes Of Loss - Cost Of Making Good**<br>**ACE0975 (11/21)-Flood And Named Windstorm Definitions Endorsement**<br>**CM 01 16 (02/12)-Florida Changes**<br>**IL 01 75 (09/07)-Florida Changes - Legal Action Against Us**<br>**IL 02 55 (04/15)-Florida Changes - Cancellation And Nonrenewal**<br>**ACE0974 (04/20)-Exclusion Of Loss Due To Virus, Bacteria Or Microorganism That Induce Physical Distress, Illness Or Disease**<br>**ACE1057 (04/22)-Exclusions - Loss, Damage or Expense Arising from Water Below the Surface of the Ground**<br>**ACE1058 (04/22)-Piling Works Exclusion Endorsement**<br>**MS-387274 (07/24)-Water Damage Deductible Endorsement**<br>**MS-388287 (07/24)-Deposit Premium Installment Payments Endorsement**<br>**MA-608255p (04/15)-Claims Directory Property and Inland Marine** |



# CONSTRUCTION RISK DECLARATIONS

SYM:  IMC        Policy ID:    I11218350 001

Company Name:    ACE American Insurance Company

**NAMED INSURED & Mailing Address**

Sarasota Bayside, LLC
121 Alhambra Plaza PH1
Coral Gables, FL   33134

Producer's Name & Address

MARSH USA
1221 BRICKELL AVENUE SUITE 1550
MIAMI, FL   33131
Z15417

| **Policy Period** | When Coverage Begins: | 06/17/2024 | 12:01 A.M. Local Time at the NAMED INSURED's Address |
|---|---|---|---|
| | When Coverage Ends: | 05/17/2026 | 12:01 A.M. Local Time at the NAMED INSURED's Address |

**General Policy Information**

**In return for the payment of premium and subject to all the terms and conditions of this Policy, the Company agrees to provide the insurance as stated in this Policy.**

Whenever "NCP" is shown below it denotes no coverage has been purchased and no coverage is provided.  Whenever "NA" is shown below it denotes "Not Applicable" to that coverage, deductible, Sub-limit of Insurance, or other policy provision.

## I.  Description, Location and Estimated Completed Value of the INSURED PROJECT at Policy Inception

A.  Estimated construction contract price: $107,556,327

B.  Value of all property not declared in A. above to be insured by this Policy and intended for installation under the construction contract, whether supplied by the INSURED PROJECT owner(s) or others(s): $0

C.  Estimated COMPLETED VALUE of the INSURED PROJECT at Policy Inception: $107,556,327

D.  Value of the EXISTING PROPERTY at Policy Inception: $0



E.  INSURED PROJECT Name: Sarasota Bayside

F.  INSURED PROJECT Description/Construction: New construction of a concrete masonry 5-story apartment building with an internal (wrap) 4-story parking garage totaling 139,972 SF.

G.  INSURED PROJECT Site: 800 Cocoanut Avenue, Sarasota, FL 34236

## II. Limits of Insurance

| $63,515,148 | (50%) | part of | $127,030,296 | Per OCCURRENCE |
|---|---|---|---|---|

The Company will pay no more for direct physical LOSS in any one OCCURRENCE than the above Limit of Insurance. In addition, the Company will not pay for more than its proportionate share (50%) of the following Sub-limits of Insurance and Annual Aggregate Sub-limits of Insurance, which are part of, and not in addition to, the Limit of Insurance above:

### Sub-limits of Insurance

| | | | |
|---|---|---|---|
| A. | Physical LOSS to the INSURED PROJECT | $ | 107,556,327 |
| B. | Delay in Opening (per Form Number ACE0729) | $ | 19,473,969 |
| C. | EXISTING PROPERTY | $ | NCP |
| D. | Damage to the Owner's EXISTING PROPERTY - Limited | $ | NCP |
| E. | Property in Transit per Conveyance | $ | 5,000,000 |
| F. | Temporary Off-site Storage and Off–site Staging Areas, any one location | $ | 5,000,000 |
| G. | Expediting Expenses and Extra Expenses | | 20% of the insured physical LOSS, or $2,500,000; whichever is less |
| H. | Debris Removal | | 25% of the insured physical LOSS, or $7,500,000; whichever is less |
| I. | Trees, Shrubs, Plants and Lawns | $ | 1,000,000 |
| J. | Protection Service Charges | $ | 100,000 |
| K. | Fire Protective Equipment Recharge | $ | 100,000 |
| L. | Valuable Papers and Records | $ | 1,000,000 |
| M. | Claim Preparation Expenses | $ | 250,000 |
| N. | Protection of Insured Property Pre-LOSS | $ | 100,000 |
| O. | Architects and Engineers Fees | $ | 1,000,000 |
| P. | Office and Construction Trailers/Semi-trailers and their Contents | $ | 100,000 |
| Q. | Ordinance or Law | $ | See ACE0769 |



| | | | |
|---|---|---|---|
| R. | TESTING | $ | Included |
| S. | Business Personal Property | $ | Included |
| T. | Contract Penalty | $ | NCP |
| U. | TOWER CRANE Re-Erection Expense | $ | 50,000 |
| V. | NAMED WINDSTORM | $ | 25,000,000 |

**Annual Aggregate Sub-limits of Insurance**

| | | | | |
|---|---|---|---|---|
| A. | FLOOD | Per OCCURRENCE | $ | 15,000,000 |
| | | Annual Aggregate | $ | 15,000,000 |
| B. | EARTH MOVEMENT | Per OCCURRENCE | $ | 127,030,296 |
| | | Annual Aggregate | $ | 127,030,296 |
| C. | Pollution or Contamination Clean-Up | Per OCCURRENCE | $ | 250,000 |
| | | Annual Aggregate | $ | 250,000 |
| D. | Limited Coverage for | Per OCCURRENCE | $ | 250,000 |
| | FUNGUS, Wet Rot, Dry Rot or Bacteria | Annual Aggregate | $ | 250,000 |

**III. Escalation Clause**   The Sub-limit of Insurance for Physical LOSS to the INSURED PROJECT stated above is considered an estimate. Should any increase in the Estimated Completed Value of the INSURED PROJECT occur, the Sub-limit of Insurance for Physical LOSS to the INSURED PROJECT will automatically increase to reflect the change concurrently, subject to a maximum increase of 5% of the original Sub-limit of Insurance stated above. The Per OCCURRENCE Limit of Insurance stated above will increase by the same amount.

This clause does not apply to other Sub-limits of Insurance, including Delay in Opening, if endorsed to this Policy, nor does it apply to the Annual Aggregate Sub-limits of Insurance.

CHUBB®

## IV. Deductibles

$50,000 direct physical LOSS in any one OCCURRENCE except;

A. LOSS in any one OCCURRENCE caused by
or resulting from FLOOD                                       $ 500,000 or 5 %
Subject to a maximum deductible of:                          $ NA

B. LOSS in any one OCCURRENCE caused by
or resulting from EARTH MOVEMENT                             $ 100,000 or NA %
Subject to a maximum deductible of:                          $ NA

C. LOSS in any one OCCURRENCE caused by
or resulting from WATER DAMAGE                               $ See ACE0975 or NA %
Subject to a maximum deductible of:                          $ See ACE0975

D. LOSS in any one OCCURRENCE caused by
or resulting from NAMED WINDSTORM                            $ 500,000 or 5 %
Subject to a maximum deductible of:                          $ NA

E. LOSS in any one OCCURRENCE caused by
or resulting from TESTING                                    $ 50,000 or NA %

F. LOSS in any one OCCURRENCE caused by
or resulting from NCP                                        $ NA or NA %

G. LOSS in any one OCCURRENCE caused by
or resulting from NCP                                        $ NA or NA %

H. LOSS in any one OCCURRENCE caused by
or resulting from NCP                                        $ NA or NA %

## V. Rates and Adjustment

| Coverage Type | Rate | | Annual Premium | Term Deposit Premium |
|---|---|---|---|---|
| INSURED PROJECT Physical LOSS | $ Various | Per $100 **Annual** | $ Various | $ ▮▮▮▮▮ |
| Delay in Opening | $ Various | Per $100 **Annual** | $ Various | $ ▮▮▮▮▮ |
| TESTING ( Included days) | $ Included | Per $100 **Annual** | $ Included | $ Included |
| TESTING ( Included days) Delay in Opening | $ Included | Per $100 **Annual** | $ Included | $ Included |
| Total Deposit Premium | | | | $ ▮▮▮▮▮ |

Subject to a minimum earned premium of $ ▮▮▮▮▮ .

CHUBB®

**VI. Extension of
Term**

This Policy may be extended for a period not to exceed <u>sixty  (60)</u> days from the original
expiration date shown above, subject to the same terms and conditions in effect at the time of
the extension, and subject to a pro-rata additional premium, exclusive of  TESTING.

NOTE:  Premium rates applicable to coverage during the period of June 1st through
November 30th (NAMED WINDSTORM Season) may differ from rates applicable during the
period December 1st through May 31st, and additional premium for extensions will reflect
those pricing differences.

The TESTING PERIOD may be extended for a period not to exceed <u>sixty  (60)</u> days from the
number of days for TESTING stated in V. Rates and Adjustment above, subject to the same
terms and conditions in effect at the time of the extension, and subject to an additional
premium based upon the number of days of the extension period.

The NAMED INSURED must request these extensions in writing and receive acceptance from
the Company prior to the original expiration date of this Policy. If the NAMED INSURED
does not provide the aforementioned written extension request(s), coverage provided
hereunder shall terminate on the original expiration date stated in this Policy.

**VII. Additional
NAMED INSURED
Information**

None

_____

_____

_____

**VIII. Mortgagee and
Loss Payee
Information**

None

_____

_____

_____

# CONSTRUCTION RISK COVERAGE FORM

Please read the entire policy carefully to determine rights, duties and what is and is not covered.

Words and phrases that appear in CAPITALS are defined in this Coverage Form. Refer to PART F. DEFINITIONS section in this Policy. Throughout this Coverage Form, the term "Company" means the company providing this insurance as shown on the Construction Risk Declarations.

## PART A
## INSURING AGREEMENT

This Policy, subject to the terms, conditions and exclusions stated herein or endorsed hereto, insures against direct physical LOSS to property of every kind and description intended to become a permanent part of, or be consumed in, the construction, fabrication, assembly, installation, erection, or alteration of the INSURED PROJECT, as described on the Construction Risk Declarations and for which values have been declared and deposit premium paid. If not covered by other insurance and if values have been declared to the Company for deposit premium calculation, this Insuring Agreement shall also apply to TEMPORARY STRUCTURES.

## PART B
## LIMITS OF INSURANCE

The Company will pay no more for direct physical LOSS in any one OCCURRENCE than the amount stated under section II. of the Construction Risk Declarations, subject to the following:

1.    Sub-limits of Insurance

      The Company will pay no more for direct physical LOSS in any one OCCURRENCE than the Sub-limit of Insurance stated under section II of the Declarations for each applicable Coverage or Extension of Coverage.

      If a Sub-Limit of Insurance for NAMED WINDSTORM or TESTING is stated on the Construction Risk Declarations that does not state "Included" or is less than the Limit of Insurance Per OCCURRENCE stated on the Construction Risk Declarations, the most the Company will pay for under this Policy in any one OCCURRENCE from a NAMED WINDSTORM or TESTING for all Coverage(s) and Extensions of Coverage in or endorsed on this Policy, including the Delay in Opening Coverage, is the Sub-limit of Insurance for NAMED WINDSTORM or TESTING stated on the Construction Risk Declarations.

2.    Annual Aggregate Sub-limits of Insurance

      Notwithstanding the foregoing, and irrespective of the stated Limit of Insurance or Sub-limits of Insurance on the Construction Risk Declarations, the most the Company will pay for direct physical LOSS in any one OCCURRENCE, and in the aggregate for direct physical LOSS from all OCCURRENCES in any one Policy year for all Coverage(s) and Extensions of Coverage in or endorsed on this Policy, including, if purchased, coverage under the Delay in Opening Endorsement, is the Annual Aggregate Sub-limit(s) of Insurance stated on the Construction Risk Declarations.

These Sub-limits of Insurance and Annual Aggregate Sub-limits of Insurance are part of, and not in addition to, the Limit of Insurance per OCCURRENCE stated on the Construction Risk Declarations.

 Copyright 2021

## PART C
## EXTENSIONS OF COVERAGE

This Policy, subject to all the terms, conditions and exclusions stated herein or endorsed hereto, is extended to insure the following extensions of coverage if a dollar value is stated in the applicable Sub-limit(s) of Insurance or Annual Aggregate Sub-limit(s) of Insurance on the Construction Risk Declarations.

1.    EXISTING PROPERTY

The Company will pay for direct physical LOSS by an insured peril to the EXISTING PROPERTY at the INSURED PROJECT site.

For the purposes of this Extension of Coverage, EXISTING PROPERTY does not include any personal property or underground utilities of any kind.

2.    Damage to the Owner's EXISTING PROPERTY – Limited

If the First NAMED INSURED is a General Contractor, the Company will pay for direct physical LOSS by an insured peril to the INSURED PROJECT owner's EXISTING PROPERTY at the INSURED PROJECT Site.  Coverage for such EXISTING PROPERTY of the INSURED PROJECT owner applies only: (1) when, at the time of direct physical LOSS, the insured property is contained within or is attached to the EXISTING PROPERTY; and (2) to the extent direct physical LOSS arises out of the contractor's performance of work on or within the EXISTING PROPERTY.

The Company shall have the right but not the duty to defend any claim alleging damage to such EXISTING PROPERTY.

For the purposes of this Extension of Coverage, EXISTING PROPERTY does not include personal property or underground utilities of any kind.

The Company will not pay for LOSS to EXISTING PROPERTY caused by or resulting from the following:

A.  Mechanical breakdown, including rupture or bursting caused by centrifugal force;
B.  Electrical injury or disturbance caused by artificially generated electrical currents;
C.  Interruption of incoming electricity, fuel, water, gas, steam, refrigerant, or other services except as specifically covered in this policy or unless such interruption of services directly result in physical LOSS not otherwise excluded by this policy.
D.  Explosion, rupture or bursting of steam boilers, steam pipes, steam turbines or steam engines owned, leased or operated under any NAMED INSURED's or Additional Insured's control. Direct physical LOSS caused by or resulting from explosion of gases or fuel within the furnace or any fired vessel or within the flues or passages through which the gases or combustion pass is covered.
E.  LOSS caused by or resulting from site work or demolition work.
F.  LOSS caused by or resulting from EARTH MOVEMENT, FLOOD, NAMED WINDSTORM or the peril of wind.
G.  Any Delay in Opening coverage, including, but not limited to; Loss of RENTAL INCOME, Loss of BUSINESS INCOME, SOFT COSTS/ADDITIONAL EXPENSES.
H.  Any Extension of Coverage for Expediting Expenses and Extra Expenses.

Exclusions A, B and C apply unless direct physical LOSS by an insured peril ensues and then this policy insures only such ensuing direct physical LOSS.

3.    Property in Transit

Property in due course of transit that is intended to become a permanent part of, or be consumed in the INSURED PROJECT and subject to the following additional conditions:

A.  Coverage shall attach upon commencement of loading and cease upon completion of unloading.

B.  No coverage is provided for airborne shipments.

C.   No coverage is provided for waterborne shipments except on coastal and inland waterways.

D.   This Extension of Coverage shall be void if the NAMED INSURED enters into any   agreement with a
carrier, releasing them from their common law or statutory liability or agreeing that this Policy shall in
any way inure to the benefit of such carriers. However, the NAMED INSURED may, without prejudice
to this Extension of Coverage, accept such bills of lading, receipts, or contracts of transportation as are
ordinarily issued by carriers containing a limitation as to the value of insured property.

4.      Temporary Off-Site Storage and Off-Site Staging Areas

Property to be used in, or incidental to, completion of the INSURED PROJECT while located in temporary
off-site storage or off-site staging areas away from the INSURED PROJECT site anywhere within the
Policy territory, excluding property:

A.   Located at the manufacturer's or supplier's site while being manufactured or processed; or

B.   While in due course of transit if such equipment is the property of, or in the care, custody and control
of a manufacturer or supplier.

5.      Expediting Expenses and Extra Expenses

In the event of direct physical LOSS insured hereunder, and occurring during the Policy period, the
Company will pay for:

A.   Expediting Expenses

The reasonable and necessary extra costs to make temporary repairs, and to expedite the permanent
repair or replacement of the insured property which is damaged by an insured peril; including:

1.   Additional wages for overtime, night work, and work on public holidays;
2.   The extra costs of express freight or other rapid means of transportation;
3.   The extra costs of rental equipment;
4.   Other reasonable expenses necessarily incurred to expedite repairs.

B.   Extra Expenses

The reasonable and necessary extra costs incurred during the period of restoration and repair of the
damaged insured property that are over and above the total costs that would normally have been
incurred during the same period of time had no direct physical LOSS occurred.  Extra Expenses shall
mean:

1.   Equipment rental;
2.   Emergency expenses;
3.   Temporary use of other property;
4.   Demobilization and remobilization of equipment and facilities;
5.   Other reasonable extra expenses necessarily incurred to reduce the amount payable for LOSS
under this Policy;

However, for the purposes of this Extension of Coverage, any costs, expenses, or loss amounts which are
otherwise covered elsewhere in this Policy are expressly excluded herein.

6.      Debris Removal

The Company will pay the expense incurred in the removal of debris of the damaged insured property
under this Policy, as a result of direct physical LOSS to insured property by an insured peril.

The Company will not pay the expense to:

A.      Extract CONTAMINANTS OR POLLUTANTS from the debris; or

B. Extract CONTAMINANTS OR POLLUTANTS from land or water; or

C. Remove, restore, or replace contaminated or polluted land or water; or

D. Remove or transport any property or debris to a site for storage or decontamination required because the property or debris is affected by CONTAMINANTS OR POLLUTANTS whether or not such removal, transport, or decontamination is required by law or regulation.

It is a condition precedent to recovery under this Extension of Coverage that the Company shall have paid or agreed to pay for direct physical LOSS to the insured property hereunder, and that the NAMED INSURED shall give written notice to the Company of intent to claim for cost of removal of debris not later than twelve months after the date of such direct physical LOSS.

Upon exhaustion of the Debris Removal Sub-limit of Insurance and the per OCCURRENCE Limit of Insurance shown on the Construction Risk Declarations, the Company will pay up to an additional $2,500,000 per OCCURRENCE and in the aggregate for debris removal.

7. Trees, Shrubs, Plants and Lawns

The Company will pay for direct physical LOSS by an insured peril to trees, shrubs, plants, and lawns, which are part of the INSURED PROJECT, and which have been installed, are in the process of being installed or awaiting installation at the INSURED PROJECT site.

8. Protection Service Charges

When a fire department, police department or other governmental authority is called to save or protect insured property from direct physical LOSS by an insured peril, the Company will pay the charges that result from:

A. A written contract or agreement between the NAMED INSURED and a fire department, police department or other governmental authority and signed prior to the direct physical LOSS; or

B. Application of a local ordinance, if required.

9. Fire Protective Equipment Recharge

The Company will pay for the cost to recharge or refill any fire protective equipment owned, in the control of, or used to protect insured property of the NAMED INSURED, when discharged:

A. To prevent or control direct physical LOSS by an insured peril;

B. Accidentally; or

C. As a result of malfunction of the equipment.

In respect of items B. and C. above, the Company will pay for amounts in excess of amounts recoverable under any manufacturer's or supplier's warranty.

10. Valuable Papers and Records

The Company will pay the cost incurred by the NAMED INSURED to research, replace, restore, or copy those valuable papers, records, documents, blueprints, plans or drawings that are directly related to the INSURED PROJECT, as a result of direct physical LOSS by an insured peril.

11.   Claim Preparation Expenses

The Company will pay necessary and reasonable expenses incurred by the NAMED INSURED for preparing and certifying details of a claim resulting from a direct physical LOSS which would be payable under this Policy, provided that the total amount of the direct physical LOSS exceeds the applicable Deductible shown on the Construction Risk Declarations.

However, in the event the direct physical LOSS does not exceed the applicable Deductible shown on the Construction Risk Declarations and this Policy is endorsed to provide Delay in Opening Coverage, the Company will pay necessary and reasonable expenses incurred by the NAMED INSURED for preparing and certifying details of a claim if the claim results in a DELAY which exceeds the applicable WAITING PERIOD.

Claim Preparation Expenses do not include:
a. Salary or wages of employees of the NAMED INSURED or any of its affiliates;
b. Fees or expenses of public adjusters or lawyers; or
c. Fees or expenses of representatives or employees of any broker or agent.

Paragraph c. above does not apply to employees of a forensic accounting practice affiliated with the NAMED INSURED's broker or agent.

12.   Protection of Insured Property Pre-LOSS

If it is necessary to protect or move insured property from an INSURED PROJECT site, off-site storage location or off-site staging area to preserve and protect it from sustaining imminent direct physical LOSS by an insured peril, the Company will pay for those reasonable and necessary expenses incurred by the NAMED INSURED in an effort to protect or remove insured property, including moving and storage expenses, but only to the extent that such expenses reduced direct physical LOSS which would otherwise be recoverable under this Policy.

The foregoing shall be subject to the deductible provisions of this Policy.

13.   Architects and Engineers Fees

In the event of direct physical LOSS by an insured peril and occurring during the Policy period, the Company will pay necessary and reasonable compensation for architect's and engineer's services and expenses incurred by the NAMED INSURED in connection with the repair or replacement of the INSURED PROJECT, but excluding any costs relating to improvements and betterments to any insured property.

This Extension of Coverage shall not apply to and shall not modify, amend, or alter the Delay in Opening Architect and Engineers Fees Coverage when a value is stated and endorsed to this Policy.

14.   Office and Construction Trailers/Semi-trailers and their Contents

The Company will pay for direct physical LOSS to office and construction trailers/semi-trailers and their contents, owned by the NAMED INSURED or in the NAMED INSURED's care, custody, or control while in, on or within 1,000 feet of the INSURED PROJECT site.

This coverage includes furniture, fixtures, data processing equipment, fax systems and phone systems but this Extension of Coverage does not apply to direct physical LOSS to tools or other contractor's equipment, jewels, jewelry, watches, money, stamps, deeds, letters of credit, documents, tickets, plans, blueprints, specifications, or other valuable papers.

This Policy is excess over any other valid or collectible insurance available to the owner of the property.

15.    Ordinance or Law

If the repair of direct physical LOSS to insured property caused by an insured peril becomes    subject to the enforcement of any ordinance or law that is in force at the time of direct physical LOSS and that:

A.    Requires the demolition of parts of the undamaged insured property; or

B.    Regulates the construction or repair of damaged insured property;

then the Company will pay for:

1.    The cost of demolishing the undamaged insured property and clearing the site of debris from such demolition; and

2.    The value of such undamaged part of the insured property that must be demolished; and

3.    The increased cost of repair and/or reconstruction of the damaged and undamaged insured property on the same site, but such payment will be limited to the minimum requirements of such ordinance or law regulating the repair or reconstruction of the damaged insured property on the same site.  However, the Company will not pay for any increased cost of repair or reconstruction unless the damaged insured property is actually rebuilt or replaced.

The Company will not pay the following costs:

i.    Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating asbestos or other hazardous material;

ii.    Cost of any governmental direction or request declaring that asbestos or other hazardous material present in, part of or utilized on any damaged or undamaged portion of insured property that can no longer be used for the purpose for which it was intended or installed and must be removed, modified, or abated;

iii.    Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating CONTAMINANTS OR POLLUTANTS; or

iv.    Cost of compliance with the enforcement of any ordinance or law which the NAMED INSURED or owner would have otherwise been required to comply by nature of such ordinance or law in the absence of any direct physical LOSS covered by this Policy.

16.    TESTING

The Company will pay for direct physical LOSS to insured property by an insured peril while such property is undergoing TESTING during the TESTING PERIOD.  Coverage shall continue on such insured property following the completion of TESTING subject to PART E POLICY CONDITIONS, Item 4. Term of Insurance.

Each of the following is a condition precedent to coverage for TESTING:

A.    All specified protective materials, systems and instrumentation are installed, activated and operational.

B.    No supervisory or safety system has been deliberately circumvented, unless such circumvention is necessary for the conduct of testing activities as recommended by written testing procedures and/or manufacturer's specifications and provided that such circumvention does not extend beyond that necessary for conduct of said individual activities.

17.    Business Personal Property

The Company will pay for direct physical LOSS by an insured peril to business personal property intended to be placed in the INSURED PROJECT. This property is insured while in transit and while located at the INSURED PROJECT site. For the purposes of this Extension of Coverage, business personal property includes furniture and fixtures to be placed in but not permanently installed as part of the INSURED PROJECT, including but not limited to business personal property such as beds, desks, chairs, dressers, nightstands, televisions, and phones.

18.    Contract Penalty

If the First NAMED INSURED is a General Contractor, the Company will pay the applicable contract penalties the first NAMED INSURED is required to pay for late completion or non-completion of the INSURED PROJECT as a result of direct physical LOSS to insured property by an insured peril. The penalties must be specified in the construction contract, signed prior to the start of construction.

It is a condition precedent to recovery under this Extension of Coverage that the NAMED INSURED use due diligence and dispatch in restoring the damaged property to the condition existing prior to the direct physical LOSS.

This Extension of Coverage shall not apply to and shall not modify, amend or alter, if purchased, coverage under the Delay in Opening Endorsement.

19.    Reward

At the Company's option, the NAMED INSURED may be reimbursed for rewards paid, other than to the NAMED INSURED, or any of the NAMED INSURED's partners, members, managers or officers, for information leading to the conviction of any one or more persons responsible for direct physical LOSS insured under this Policy. The Company will be the sole judge as to the payment and amount of the reimbursement.

The most the Company will pay in any one OCCURRENCE under this Extension of Coverage is $15,000.

20.    TOWER CRANE Re-Erection Expense

If a TOWER CRANE not covered under this Policy is damaged as a result of direct physical LOSS by an insured peril while at the INSURED PROJECT Site, the Company will pay the reasonable and necessary costs incurred by the NAMED INSURED to re-erect a TOWER CRANE if necessary, to complete the INSURED PROJECT.

This Extension of Coverage shall not apply to and shall not modify, amend, or alter any other coverage insured by this Policy, Extension of Coverage or, if purchased, coverage under the Delay in Opening Endorsement.

21.    Pollution or Contamination Clean-Up

The Company will pay necessary and reasonable expenses incurred by the NAMED INSURED to clean-up and remove CONTAMINANTS OR POLLUTANTS from land or water confined to the INSURED PROJECT site(s) if the release, discharge, or dispersal is caused by or results in direct physical LOSS that occurs during the Policy period, and which is not excluded by this Policy.

The Company will not pay for the costs to test for, monitor or assess the existence, concentration or effects of CONTAMINANTS OR POLLUTANTS except for testing which is performed in the course of clean-up and removal of the CONTAMINANTS OR POLLUTANTS from the land or water.

No liability shall exist under this provision unless such expenses are reported to the Company within 180 days of the date of direct physical LOSS.

22.    Limited Coverage for FUNGUS, Wet Rot, Dry Rot or Bacteria

A.    The coverage described below in B. only applies when FUNGUS, wet rot, dry rot or bacteria results directly from an OCCURRENCE that is insured by this Policy, which takes place during the policy period and only if all reasonable means were used to save and preserve the property from further direct physical LOSS at the time of and after that OCCURRENCE.

B.    Under this Extension of Coverage, the Company will pay for:

1.    Direct physical LOSS to insured property at the INSURED PROJECT caused by FUNGUS, wet rot, dry rot or bacteria, including the cost of removal of the FUNGUS, wet rot, dry rot or bacteria;

2.    The cost to tear out and replace any part of a building or other insured property as needed to gain access to FUNGUS, wet rot, dry rot or bacteria; and

3.    The cost of testing performed after removal, repair, replacement, or restoration of the damaged insured property is completed, provided there is a reason to believe that FUNGUS, wet rot, dry rot or bacteria are present.

If there is insured direct physical LOSS to the INSURED PROJECT, that is not caused by FUNGUS, wet rot, dry rot or bacteria, payment will not be limited by the terms of this Extension of Coverage, except to the extent that FUNGUS, wet rot, dry rot or bacteria causes an increase in the direct physical LOSS. Any such increase in the direct physical LOSS will be subject to the terms of this Extension of Coverage.


# PART D
# EXCLUSIONS

## Property Excluded

This Policy does not insure:

1.    Land and land values and the value of cut, fill and backfill materials existing at the INSURED PROJECT site prior to project commencement; however, to the extent included in the contract bid documents and declared for premium purposes, the value of fill and backfill materials purchased for use in the completion of the INSURED PROJECT is not excluded.

Notwithstanding the foregoing, labor and material charges incurred to move, remove, place, or otherwise handle cut, fill and backfill materials, whether insured or uninsured in the foregoing, are covered to the extent such charges are included in the contract bid documents and declared for premium purposes;

2.    Construction tools and construction equipment;

3.    Vehicles or equipment licensed for highway use, watercraft, or aircraft;

4.    Railroad rolling stock;

5.    Water, animals of any kind, standing timber, and growing crops;

6.    Trees, shrubs, plants, and lawn except as provided under the Extension of Coverage for Trees, Shrubs, Plants and Lawns;

7.    Accounts, bills, currency, stamps, deeds, evidence of debt, checks, money, securities, or other property of a similar nature;

8.    EXISTING PROPERTY at the INSURED PROJECT site, unless the value of same is declared to the Company and if a Sub-limit of Insurance is shown on the Construction Risk Declarations;

9.      Property at locations other than at the INSURED PROJECT site, except Property that is in Transit or at Temporary Off-site Storage and Off-site Staging Areas if a Sub-limit of Insurance is shown on the Construction Risk Declarations;

10.     Prototype, developmental, used machinery and equipment or any catalysts while undergoing any form of TESTING;

11.     Refractory linings and brickwork during TESTING from the time of the first application of heat, unless LOSS directly results from physical LOSS to other insured property by an insured peril;

12.     TRANSMISSION AND DISTRIBUTION LINES outside of the INSURED PROJECT site.

13.     Any property while located at any site which stores, processes, or otherwise handles or makes use of radioactive materials unless reported to and accepted by the Company.  The foregoing shall not apply to locations or property making use of radioactive isotopes contained within equipment used for diagnostic or testing purposes.


## **Excluded Causes of LOSS**

**I.   This Policy does not insure LOSS caused directly or indirectly by any of the following, and such LOSS is excluded regardless of any other cause or event that contributes concurrently, or in any sequence to the LOSS:**

1.      A.      Hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual, impending, or expected attack:

                1.      By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

                2.      By military, naval, or air forces; or

                3.      By an agent of any such government, power, authority, or forces; it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion will be conclusively presumed to be such a hostile or warlike action by such government, power, authority, or forces;

        B.      Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against such occurrence.

2.      LOSS, damage, costs, expenses, fines, or penalties incurred or sustained by or imposed on any NAMED INSURED at the order of any government agency, court or authority arising from any cause whatsoever, except physical destruction of insured property by order of public authority to prevent spread of fire or explosion.

3.      Nuclear reaction or radiation or radioactive contamination however caused.  If fire ensues, liability is specifically assumed for direct physical LOSS by such ensuing fire, but not including any direct physical LOSS due to nuclear reaction, nuclear radiation, or radioactive contamination.

4.      Dishonest or criminal act committed by:

        A.      the NAMED INSURED or by any of the NAMED INSURED's partners, employees, directors, trustees, or authorized representatives;

        B.      a manager or a member, or their partners, employees, directors, or authorized representatives, if the NAMED INSURED is a limited liability company;

        C.      anyone else with an interest in the insured property, or their employees or representatives; or

        D.      anyone else to whom the insured property in entrusted for any purpose.

This Excluded Cause of LOSS applies whether or not such persons are acting alone or in collusion with other persons or such acts occur during the hours of employment.

This Excluded Cause of LOSS does not apply to insured property that is entrusted to others who are carriers for hire or to acts of destruction by employees of the NAMED INSURED. But theft by employees of the NAMED INSURED is excluded.

5.  Shortage found upon taking inventory.

6.  Mysterious Disappearance.

7.  Infestation, disease, freeze, drought and hail, weight of ice or snow, or any damage caused by insects, vermin, rodents, or animals, but only as respects Trees, Shrubs, Plants and Lawns.

8.  Consequential loss, damage or expense of any kind or description, whether caused by an insured peril or otherwise, including but not limited to:

    A.  Loss of market or delay, loss of use, loss of warranty, liquidated damages, performance penalties, penalties for non-completion, delay in completion, or non-compliance with contract conditions;

    B.  General conditions, extended general conditions, or contractor's or subcontractor's overhead or profit pertaining to work at the INSURED PROJECT Site other than such costs or expenses which are reasonable and necessary to repair or replace such part of the INSURED PROJECT which has been damaged;

    C.  Resequencing of construction activities at the INSURED PROJECT Site;

    D.  Inefficiencies of construction activities at the INSURED PROJECT Site.

9.  LOSS covered under any written or implied guarantee or warranty by any manufacturer or supplier.

10. Asbestos Hazard:

    A.  Asbestos, asbestos-containing product, or asbestos-containing material.

    B.  LOSS, cost, expense, fine or penalty resulting from or arising out of:

        1.  Asbestos remediation, including removal or modification, of any asbestos, asbestos-containing product, or asbestos-containing material, from a building or structure of any kind, whether damaged or undamaged, and regardless of the reason such removal is undertaken, whether voluntary or compelled by government directive.

        2.  Demolition or increased cost of reconstruction, repair, debris removal or loss of use when caused by, arising out of, or undertaken due to the enforcement of any law, regulation, rule, or ordinance that in any manner regulates asbestos, asbestos-containing product, or asbestos-containing material, except to the extent that coverage is provided under the Ordinance or Law Extension of Coverage.

        3.  Any fault in the design, manufacture, or installation of asbestos, asbestos-containing product, or asbestos-containing material.

        4.  Any governmental direction or request declaring that asbestos, asbestos-containing product, or asbestos-containing material present in or part or utilized on any undamaged portion of the insured property can no longer be used for the purpose for which it was intended or installed and must be removed or modified.

    C.  Notwithstanding the exclusions set forth above, this Policy insures direct physical LOSS to asbestos, asbestos-containing product and asbestos-containing material which is physically incorporated into

an insured building or structure, including the necessary costs to remove or remediate such damaged asbestos, but only when such damage occurring during the policy period is directly and solely caused by the following perils, and then only that part of such asbestos which incurs direct physical LOSS: fire, lightning, aircraft impact, explosion, riot, civil commotion, smoke, vehicle impact, windstorm or hail, vandalism, malicious mischief, leakage or accidental discharge from automatic fire protective systems.

11.    LOSS caused by, resulting from, contributed to, or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS OR POLLUTANTS, all whether direct or indirect, proximate, or remote or in whole or in part caused by, contributed to, or aggravated by any physical damage insured by this Policy.

Nevertheless, if fire is not excluded from this Policy and a fire arises directly or indirectly from the release, discharge, escape or dispersal of CONTAMINANTS OR POLLUTANTS, any covered LOSS which arises directly from that fire shall (subject to the terms, conditions, and limitations of this Policy) be insured.

This Excluded Cause of LOSS shall not apply when direct physical LOSS is directly caused by fire, lightning, aircraft impact, explosion, riot, civil commotion, vandalism, malicious mischief, smoke, vehicle impact, windstorm, or hail.  This Excluded Cause of LOSS shall also not apply when direct physical LOSS is directly caused by leakage or accidental discharge from automatic fire protective systems.

12.    The increased cost to comply with the enforcement of any ordinance or law that:

A.    Requires the demolition of parts of undamaged insured property;

B.    Regulates the construction or repair of damaged insured property;

This Excluded Cause of LOSS does not apply to the extent coverage is provided in the EXTENSIONS OF COVERAGE – Ordinance or Law.

13.    LOSS, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of:

A.    ELECTRONIC DATA by any cause whatsoever (including but not limited to COMPUTER VIRUS or MALICIOUS PROGRAMMING); and/or

B.    ELECTRONIC MEDIA caused by or resulting from the LOSS, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of ELECTRONIC DATA;

regardless of any other cause or event that contributes concurrently or in any sequence to the LOSS, damage, destruction, distortion, erasure, corruption, alteration, diminishment in value, or loss of use or usefulness of ELECTRONIC DATA or ELECTRONIC MEDIA.

This Excluded Cause of LOSS does not apply to direct physical LOSS of ELECTRONIC DATA or ELECTRONIC MEDIA caused by or resulting from the perils of Fire, Lightning, Explosion, Aircraft or Vehicle Impact, Falling Objects, Windstorm, Hail, Tornado, NAMED WINDSTORM, EARTH MOVEMENT or Volcanic Action, FLOOD, Freeze or Weight of Snow, Theft, or Riot, if, and to the extent, such peril causing the direct physical LOSS is otherwise covered by this Policy.

14.    Any LOSS or expense consisting of, caused by, contributed to, or aggravated by FUNGUS, wet rot, dry rot, or bacteria, whether directly or indirectly the result of an insured peril.  This includes, but is not limited to, the cost for investigation, testing, remediation services, extra expense, or business interruption. Such LOSS is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the LOSS.

If direct physical LOSS otherwise covered by this Policy occurs, and the cost of removal of debris is increased due to the presence of FUNGUS, wet rot, dry rot or bacteria, this Policy will only be liable for the costs of debris removal which would have been incurred had no such factors been present in, on, or about the insured property to be removed.

This Excluded Cause of LOSS does not apply to the extent coverage is provided in the EXTENSIONS OF COVERAGE – Limited Coverage for FUNGUS, Wet Rot, Dry Rot or Bacteria.

15. FLOOD, unless a dollar value or "Included" is stated in the applicable FLOOD Annual Aggregate Sub-limits of Insurance on the Construction Risk Declarations. This exclusion does not apply to direct physical LOSS by fire or explosion resulting from FLOOD nor does it apply to Property in Transit.

16. EARTH MOVEMENT, unless a dollar value or "Included" is stated in the applicable EARTH MOVEMENT Annual Aggregate Sub-limits of Insurance on the Construction Risk Declarations. This exclusion does not apply to direct physical LOSS by fire or explosion resulting from EARTH MOVEMENT nor does it apply to Property in Transit.

17. Any LOSS to insured property caused by, resulting from or while undergoing TESTING, unless a dollar value or "Included" is stated in the applicable TESTING Sub-limit of Insurance on the Construction Risk Declarations.

**II. This Policy does not insure LOSS caused by or resulting from any of the following, unless direct physical LOSS by an insured peril ensues and then this Policy insures only such ensuing direct physical LOSS:**

1. Corrosion, decay, deterioration, erosion, evaporation, inherent vice, latent defect, leakage, loss of weight, rust, shrinkage, wear and tear or any quality in property which causes it to damage or destroy itself.

2. Normal settling, shrinking, cracking, expansion, or contraction.

3. Dryness or dampness of atmosphere.

4. Extremes or changes in temperature.

5. Heat, humidity, or condensation.

**III. Cost of Making Good**

This Policy does not insure the costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the LOSS:

A. Fault, defect, error, deficiency or omission in design, plans, specifications, engineering, or surveying;

B. Faulty or defective workmanship, supplies, or material;

However, if direct physical LOSS by an insured peril ensues, then this Policy will provide cover for such ensuing LOSS only.

For the purpose of this Policy and not merely this Excluded Cause of LOSS, insured property, or any portion thereof, shall not be regarded as damaged solely by virtue of the existence of any condition stated under A. or B. above.

**PART E**
**POLICY CONDITIONS**

These Policy Conditions apply to the entire Policy, including any endorsements attached to or made part of this Policy.  However, to the extent that these Policy Conditions are in conflict with any State Changes or State Amendatory endorsements attached to or made part of this Policy, the conditions of the State Changes or State Amendatory endorsements shall take precedence.

1.    First NAMED INSURED

The first NAMED INSURED shown on the Construction Risk Declarations will be the sole agent for all other NAMED INSUREDS, Additional Insureds and any other person or entity insured under this Policy for the following: giving and receiving of notices under this Policy, including notice of cancellation or nonrenewal; receiving any return premium that becomes payable under the Policy; requesting or agreeing to amend terms and conditions of this Policy; and adjusting LOSS under this Policy.

2.    Additional Insureds

To the extent required by any written contract or subcontract for the INSURED PROJECT, and then only as their respective interests may appear, all owners, all contractors, and subcontractors of every tier of the INSURED PROJECT, and any other individual or entity specified in such written contract or subcontract, are recognized as Additional Insureds hereunder.  As respects architects, engineers, manufacturers and suppliers, their interest is limited to their site activities only.

3.    LOSS Payable

LOSS, if any, shall be adjusted with and made payable to the NAMED INSURED, or as per order of the NAMED INSURED, whose receipt shall constitute a release in full of all liability under this Policy with respect to such LOSS.

4.    Term of Insurance

Coverage provided hereunder shall attach as of the date shown on the Construction Risk Declarations and shall continue in full force and effect until:

A.    the expiration date shown on the Construction Risk Declarations,

B.    final acceptance of the INSURED PROJECT by the owner,

C.    abandonment of the INSURED PROJECT by the NAMED INSURED, or

D.    the expiration of the NAMED INSURED's interest in the INSURED PROJECT;

whichever first occurs.

**Permission to Occupy**

The owner may occupy the INSURED PROJECT for the purpose originally intended without the Company's written consent. The NAMED INSURED agrees that all planned fire protection and security systems will be installed, activated and operational on each floor of the building(s) or structure(s) to be occupied prior to and during such occupancy.

5.    Premium

A.    Deposit Premium:  The premium stated on the Construction Risk Declarations is a deposit premium and shall be adjusted in accordance with Paragraph 5.C. Premium Adjustment.  The deposit premium shall be due and payable within thirty (30) days of the effective date shown or per the date noted on the invoice, whichever is earlier.

B. Reporting Provisions:  Not later than thirty (30) days after the expiration, cancellation, or any requested extension of this Policy, the NAMED INSURED shall report to the Company the total COMPLETED VALUE of all property including, but not limited to, all wages, expenses, materials, supplies, equipment, and such other charges, all whether provided by the owner, contractor, or others, which became a part of or was expended in the INSURED PROJECT.

C. Premium Adjustment:

   1. The final earned premium for this Policy shall be computed by applying the rates used for the purpose of computing the deposit premium to the actual term of coverage provided and the total COMPLETED VALUE declared in accordance with Paragraph E.5.B. Reporting Provisions.

   2. If the premium so calculated shall differ from the deposit premium, such difference shall be due and payable to the NAMED INSURED or the Company, as the case may be.

   3. If the final COMPLETED VALUE reported to the Company for the INSURED PROJECT varies by no more than 5% from the estimated COMPLETED VALUE at inception, then the Company and the NAMED INSURED agree that no Premium Adjustment will occur.  Any variation in COMPLETED VALUE greater than 5% will require a Premium Adjustment per 1. and 2. above using the estimated COMPLETED VALUE of the INSURED PROJECT at inception as the base.

D. Minimum Earned Premium:

   1. If the NAMED INSURED cancels this Policy before the expiration date of the Policy, the Company will charge a minimum earned premium as stated on the Construction Risk Declarations.  If the Company cancels the Policy, no minimum earned premium applies.

   2. If the NAMED INSURED cancels the Policy, the Company will calculate the return premium as determined by this Clause E.5. Premium, the Policy Reporting Endorsement, if any, and amendatory endorsements, if any, attached to this Policy.  After the Company determines the return premium, the Company will subtract it from the Policy term premium to determine the earned premium.

   3. The Company will then compare the earned premium to the minimum earned premium stated on the Construction Risk Declarations.  If the earned premium is less than the minimum earned premium, the Company will return to the NAMED INSURED the difference between the Policy term premium and the minimum earned premium.  If the earned premium is more than the minimum earned premium, the Company will return to the NAMED INSURED the difference between the Policy term premium and the earned premium as determined by this Clause 5. Premium, the Policy Reporting Endorsement, if any, and amendatory endorsements, if any, attached to this Policy.

6.   Deductibles

The Company will adjust all direct physical LOSS arising out of any one OCCURRENCE as one LOSS. The Company will not pay for direct physical LOSS in any one OCCURRENCE until the amount of the adjusted direct physical LOSS exceeds the applicable deductible stated on the Construction Risk Declarations. The Company will then pay the amount of the direct physical LOSS in excess of the applicable deductible.

Where a percentage deductible is shown on the Construction Risk Declarations, the deductible shall be the greater of the dollar amount shown, or the stated percentage of the total insured values in place at the INSURED PROJECT site or sites sustaining direct physical LOSS in any one OCCURRENCE, unless a maximum deductible is listed.

In the event that more than one deductible shown on the Construction Risk Declarations, or provided in any endorsement, shall apply to covered direct physical LOSS in any one OCCURRENCE, only the largest deductible shall be applied.

However, if this Policy is extended to provide coverage for Delay in Opening, the deductible stated on the applicable endorsement will be applied separately and in addition to the deductible(s) for the other coverages provided in this Policy.

7.     Valuation

At the time and place of direct physical LOSS, the basis of adjustment of a claim, unless otherwise endorsed herein, shall be as follows:

A.     Property Under Construction – The cost to repair or replace the insured property lost or damaged with material of like kind and quality, less betterment, including contractor's reasonable profit and overhead not exceeding the percentages in the original contract. If the insured property is not repaired or replaced, then direct physical LOSS shall be settled on the basis of ACTUAL CASH VALUE.

B.     EXISTING PROPERTY - The Company will pay the least of the following for direct physical LOSS to EXISTING PROPERTY:

1.     The ACTUAL CASH VALUE of the EXISTING PROPERTY;
2.     The cost of reasonably restoring the EXISTING PROPERTY to its condition immediately prior to the direct physical LOSS;
3.     The cost of replacing the EXISTING PROPERTY with substantially identical property unless replacement with substantially identical property is impossible or unnecessary.  In such case, FUNCTIONAL REPLACEMENT COST would apply.

C.     Property of Others (Including Items Supplied by the Owner) – If Property of Others is new, the cost to repair or replace the insured property lost or damaged with material of like kind and quality, less betterment.  If Property of Others is not new then, the Owner's cost or ACTUAL CASH VALUE, whichever is less.

If the Property of Others is not repaired or replaced, then direct physical LOSS shall be settled on the basis of ACTUAL CASH VALUE.

D.     TEMPORARY STRUCTURES – The cost to repair or replace the insured property lost or damaged with material of like kind, quality, and condition but in the event the insured property is not repaired or replaced recovery will not exceed the ACTUAL CASH VALUE.

E.     Valuable Papers and Records - The cost to reproduce the insured property with other property of like kind and quality including the cost of gathering or assembling information from back up data if replaced, or if not replaced, at the value of blank material.

F.     ELECTRONIC MEDIA or ELECTRONIC DATA - The cost of the blank media, plus the costs of copying or restoring ELECTRONIC DATA from back-up or from originals of a previous generation, not including research and engineering or the costs or expense of recreating, gathering, or assembling such ELECTRONIC DATA.

This Policy does not insure any amount pertaining to the value of such ELECTRONIC DATA to the Named Insured or any other party, even if such ELECTRONIC DATA cannot be recreated, gathered, or assembled.  If not repaired, replaced, or restored, ELECTRONIC MEDIA shall be valued at the cost of the blank media.

G.     Trees, Shrubs, Plants and Lawns - The cost to replace with property of like kind and quality plus the proper proportion of labor expended if such damage occurs after installation.

H.     Office and Construction Trailers/Semi-trailers and their Contents – If not more than 5 years old as of the expiration date of this Policy, based on the manufacturer's model year, and the NAMED INSURED repairs or replaces the insured property, the least of the following shall apply:

1.     The cost to replace the lost or damaged insured property, without deduction for depreciation, with new property of comparable quality and utility;

2.   The amount the NAMED INSURED spends to repair or replace the lost or damaged insured property.

If the insured property is more than 5 years old or the NAMED INSURED does not actually repair or replace the insured property within a reasonable period of time after the date of direct physical LOSS, the Company will pay the ACTUAL CASH VALUE.

The Company will pay for direct physical LOSS to insured property by determining its REPLACEMENT COST, provided that the NAMED INSURED actually repairs or replaces the lost or damaged insured property, or begins to repair the damaged insured property, within 24 months from the date of direct physical LOSS; otherwise, the Company will pay for direct physical LOSS to insured property by determining its ACTUAL CASH VALUE.

8.   Cancellation

A.   This Policy may be cancelled by the NAMED INSURED by mailing to the Company written notice stating when, thereafter, such cancellation shall be effective.  The Company may cancel this Policy by mailing to the NAMED INSURED at the address shown in the Policy written notice stating when, not less than sixty (60) days thereafter, such cancellation will be effective.  In the event of non-payment, the Company shall give fifteen (15) days notice.  The mailing of notice as shall be sufficient proof of notice and the effective date of cancellation stated in the notice shall become the end of the Policy period.  Delivery of such written notice either by the NAMED INSURED or by the Company shall be equivalent to mailing.

B.   If the NAMED INSURED or the Company cancels, earned premiums shall be computed in accordance with Part E.5.C. Premium Adjustment and Part E.5.D. Minimum Earned Premium.

C.   Premium adjustment may be made at the time cancellation is effected and, if not then made, shall be made as soon as practicable after cancellation becomes effective.  The Company's check or the check of its representative mailed or delivered as aforesaid shall be a sufficient tender of any refund of premium due to the NAMED INSURED.

9.   Inspection and Audit

While this Policy is in effect, the Company may, at any reasonable time, inspect the NAMED INSURED's property and operations.  However, any recommendations or information provided as a result of such inspection(s) is not intended as a substitute for advice from a safety expert or legal counsel the NAMED INSURED may retain for their intended purpose(s). It is not intended to satisfy any legal duty the NAMED INSURED may have to provide a safe premises, workplace, product, or operation.

The Company may also examine and audit the NAMED INSURED's books and records at any reasonable time during the Policy period, and within one year after the final termination of the Policy, as long as they relate to the subject matter of this Policy.

10.   Assignment

The NAMED INSURED agrees not to assign and/or transfer any legal rights or interests in the Policy without the Company's written consent.

11.   Abandonment

There will be no abandonment of any insured property to the Company.

12.   Appraisal

If the NAMED INSURED and the Company fail to agree on the amount of the LOSS, each, upon written demand of either the NAMED INSURED or the Company, shall select a competent and disinterested appraiser.  The appraisers shall then select a competent and disinterested umpire. If they should fail for

fifteen (15) days to agree upon such umpire, then upon the request of the NAMED INSURED or the Company, such umpire shall be selected by a judge of a court of record in the jurisdiction in which such appraisal is pending.  Then, at a reasonable time and place, the appraisers shall appraise the LOSS based on the Valuation conditions within the Policy. If the appraisers agree, their written agreement shall determine the amount of LOSS and shall be paid by the Company within thirty (30) days thereafter. If the appraisers fail to agree, they shall submit their differences to the umpire.  The umpire shall then submit a written award resolving such differences.  Such award shall determine the amount of the LOSS and shall be paid by the Company within thirty (30) days thereafter.

The NAMED INSURED and the Company shall each pay its chosen appraiser and shall bear equally the other expenses of the appraisal and umpire.  The Company shall not be held to have waived any of its rights by any act relating to appraisal.

13.    In Case of LOSS

    A.    Notice of OCCURRENCE:

        The NAMED INSURED will, as soon as practicable, report in writing to the Company every OCCURRENCE that may give rise to a claim under this Policy.

    B.    Proof of LOSS:

        The NAMED INSURED will as soon as practicable, file with the Company a signed and sworn detailed proof of LOSS.

    C.    Duty to Cooperate:

        The NAMED INSURED shall cooperate with the Company in the investigation of the LOSS and settlement of the claim.

    D.    Payment of LOSS:

        All adjusted claims, including partial payments thereon will be due and payable no later than thirty (30) days after presentation and acceptance of proof of LOSS or partial proof of LOSS, as the case may be, by this Company or its appointed representative.

14.    Other Insurance

    Except as stated in the Contributing Insurance and Excess Insurance articles, if there is other insurance which is issued by another valid policy or policies of insurance, whether primary or excess, whether collectible or not, this Policy will apply as excess insurance and will not contribute with such other insurance, nor shall the Company be liable to make any payment in connection with any such portion of a claim or suit.

15.    Contributing Insurance

    Permission is granted for other policies written upon the same plan, conditions, and provisions as those contained herein.

    This Policy will contribute to the total of each LOSS otherwise payable herein to the extent of the participation of this Policy in the total Limit of Insurance, as provided by all policies written upon the same plan, conditions, and provisions as those contained in this Policy.

    The adjustment of losses by any contributing insurance company is not binding on any other contributing insurance company.

16.    Excess Insurance

Permission is granted the NAMED INSURED to have excess insurance over the Limit of Insurance set forth in this Policy without prejudice to this Policy, nor will the existence of such insurance, if any, reduce any liability under this Policy.

17.    Pair and Set

A.    In the event of direct physical LOSS to any insured article or articles which are part of a pair or set, the measure of direct physical LOSS to such article or articles will be a reasonable and fair proportion of the total value of the pair or set, giving consideration to the importance of said article or articles, but in no event will such direct physical LOSS be construed to mean total direct physical LOSS of the pair or set, or

B.    In the event of direct physical LOSS to any part of insured property consisting, when complete for use, of several parts, the Company will only be liable for the value of the part lost or damaged.

18.    Recovery or Salvage

Any recovery or salvage will apply as if recovered or received prior to the LOSS settlement and the LOSS will be readjusted accordingly, except for:

A.    proceeds from subrogation and other insurance recovered or received after a LOSS settlement under this Policy;

B.    any recovery from suretyship, insurance, reinsurance, security, or indemnity taken by or for the benefit of the Company.

19.    Reinstatement

With the exception of direct physical LOSS caused by insured perils which are subject to Annual Aggregate Sub-limits of Insurance, any LOSS hereunder will not reduce the limits available under this Policy.

20.    Subrogation

If the Company pays a claim under this Policy, it will be subrogated, to the extent of such payment, to all the NAMED INSURED's rights of recovery from other persons, organizations, and entities.  The NAMED INSURED will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

The Company will have no rights of subrogation against:

A.    any person or entity, which is an Additional Insured, but only to the extent of their interest in the damaged insured property;

B.    any other person or entity, against which the NAMED INSURED has waived its rights of subrogation in writing before the time of direct physical LOSS.

Notwithstanding the foregoing, it is a condition of this Policy that the Company shall be subrogated to all the NAMED INSURED's unwaived rights of recovery against:

A.    Any Architect or Engineer, whether or not a NAMED INSURED or Additional Insured, for any LOSS arising out of the performance of professional services in their capacity as such and caused by any error, omission, deficiency or act of the Architect or Engineer, by any person employed by them or by any others for whose acts they are legally liable, and;

B.    Any manufacturer or supplier of machinery, equipment, or other property, whether or not a NAMED INSURED or Additional Insured, for the cost of making good any LOSS which said party has agreed to make good under a guarantee or warranty, whether expressed or implied.

The NAMED INSURED will act in concert with the Company and all other interests concerned in the exercise of such rights of recovery.

If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the costs of recovery, will accrue first to the Company in proportion to their respective interests. Any excess of this amount will be remitted to the NAMED INSURED. If there is no recovery, the interests instituting the proceedings will bear the expense of the proceedings proportionately.

The NAMED INSURED will do nothing after LOSS to prejudice such rights of subrogation.

21.    Misrepresentation and Fraud

This Policy shall be void if the NAMED INSURED has intentionally concealed or misrepresented any material fact(s) or circumstance(s) concerning this insurance or the subject thereof, or in case of any fraud, attempted fraud or false swearing by the NAMED INSURED concerning any matter relating to this insurance or the subject thereof, whether before or after a LOSS.

22.    Legal Action Against the Company

No one may bring a legal action against the Company under this Policy unless:

A. There has been full compliance with all the conditions of this Policy; and

B. The action is brought within 2 years after the NAMED INSURED first has knowledge of the direct physical LOSS.

23.    Benefit to Bailee

The Policy will not inure, directly or indirectly, to the benefit or any carrier or bailee.

24.    Coverage Territory

This Policy covers insured property within the United States of America, including the District of Columbia and property in inland transit from Canada; except that this Policy will not cover Property in Transit by water or air to and from Alaska or to and from Hawaii.

25.    Certificates of Insurance

Any Certificate of Insurance issued in connection with this Policy shall be issued solely as a matter of convenience or information for the addressee(s) or holder(s) of said Certificate of Insurance. This Policy may only be modified by endorsement issued by the Company.

26.    Statutes

If any of the Articles herein stated conflict with the laws or statutes of any jurisdictions in which this Policy applies, the same is amended to conform to such laws or statutes.

27.    Observance of Conditions

Full compliance with all terms and conditions of this Policy by the NAMED INSURED shall be a condition precedent to any liability of the Company to make payment for LOSS under this Policy.

28.    Increased Hazard

If there is a material increased hazard in the risk, change in project scope or change in project principals, the NAMED INSURED shall give notice in writing to the Company within 30 days of the NAMED INSURED's knowledge of the same. The Company shall have the right, but not the obligation, to modify the terms of insurance in accordance with the terms and conditions that would apply to the material increased hazard.

29.    Examination Under Oath

The NAMED INSURED shall submit and, so far as is within their power, shall cause all other persons to submit, to examination or examinations under oath by any persons named by the Company relative to any and all matters in connection with a claim, and shall produce for examination all books of accounts, bills, invoices, and other vouchers or certified copies thereof if originals are lost, at such reasonable time and place as may be designated by the Company or its representatives as often as the Company deems necessary, and shall permit extracts and copies thereof to be made.

30.    Brands and Trademarks

In any case of direct physical LOSS by an insured peril to insured property bearing a brand, trademark or label, the Company may take all or any part of the insured property at any agreed or appraised value.  If so, the NAMED INSURED may, at its own expense:

A.    Stamp salvage on the insured property or its container, if the stamp will not physically damage the insured property; or

B.    Remove the brand, trademark or label if doing so will not physically damage the insured property. The NAMED INSURED must re-label the insured property or its container to comply with the law.

31.    Protection of Insured Property

The NAMED INSURED will take reasonable steps to protect, recover or save the insured property and minimize any further or potential LOSS when the insured property has sustained direct physical LOSS by an insured peril.  The acts of the NAMED INSURED or the Company in protecting, recovering, or saving the insured property will not be considered a waiver or an acceptance of abandonment.  The NAMED INSURED and the Company will bear the reasonable expense incurred proportionate to their respective interests under this Policy.

32.    Mortgage Holders

The entities listed on the Construction Risk Declarations and designated as a Mortgage Holder are added to this Policy for the INSURED PROJECT covered by this Policy, subject to the following terms and conditions:

The term "mortgage holder" includes a trustee.

A.    The Company will pay for LOSS, if any, to each mortgage holder shown in the mortgage holder schedule in their order of precedence, as interests may appear.

B.    The mortgage holder has the right to receive LOSS payment even if the mortgage holder has started foreclosure or similar action on the INSURED PROJECT.

C.    If the Company denies a claim due to the acts of the NAMED INSURED or because the NAMED INSURED has failed to comply with the terms of this Policy, the mortgage holder will still have the right to receive LOSS payment if the mortgage holder:

1.    Pays any premium due under this Policy at the request of the Company if the NAMED INSURED has failed to do so.

2.    Submits a signed, sworn proof of LOSS within 60 days after receiving notice from the Company of the NAMED INSURED'S failure to do so; and

3.    Has notified the Company of any change in ownership, occupancy, or substantial change in risk known to the mortgage holder.

All terms of this Policy will then apply directly to the mortgage holder.

D.    If the COMPANY pays the mortgage holder for any LOSS and denies payment to the NAMED INSURED because of their acts or because they have failed to comply with the terms of this Policy:

1.    The mortgage holder's rights under the mortgage will be transferred to the Company to the extent of the amount paid; and

2.    The mortgage holder's right to recover the full amount of the mortgage holder's claim will not be impaired.

At the option of the Company, the Company may pay to the mortgage holder the whole principal on the mortgage plus any accrued interest.  In this event, the mortgage and note will be transferred to the Company and the NAMED INSURED will pay the remaining mortgage debt to the Company.

E.    If the Company cancels this Policy, the Company will give written notice to the mortgage holder at least:

1.    Fifteen (15) days before the effective date of cancellation, if cancelled for non-payment of premium; or

2.    Forty-Five (45) days before the effective date of cancellation, if cancelled for any other reason.

The Company's failure to provide notice of cancellation to the mortgage holder will not invalidate the cancellation.

F.    If the Company does not renew the Policy, the Company will give written notice to the mortgage holder at least forty-five (45) days before the expiration date of this Policy. The Company's failure to provide notice to the mortgage holder will not invalidate the non-renewal.

32.    Blanket Loss Payees

Any individual or organization having a valid financial interest in insured property where such financial interest is secured through a debt instrument, including a loan or trust certificate, will be considered a Loss Payee for the purposes of this Policy; providing, however, and as a condition precedent to qualification hereunder as Loss Payee, that such debt instrument be executed prior to any LOSS to such insured property. Additionally, any such Loss Payee interest in insured property must be reported to the Company. The NAMED INSURED must do this not later than the time the Proof of LOSS is submitted to the Company.

The Company will adjust a LOSS with the NAMED INSURED shown on the Construction Risk Declarations and the Company will pay the NAMED INSURED, and the Loss Payee(s), up to their interest in insured property, the amount the Company owes, if anything.

## PART F
## DEFINITIONS

The following definitions will be applied in the interpretation of certain wording used herein:

1.    ACTUAL CASH VALUE

The replacement cost at the time of direct physical LOSS, of the insured property damaged or destroyed, less depreciation.

2.    COMPLETED VALUE

The projected full value of the INSURED PROJECT at the date of completion.

3.    COMPUTER VIRUS

Instructions, code, applications, or any software program that has the ability or is suspected to have the ability to damage, destroy, erase, corrupt, alter, or prevent access to ELECTRONIC DATA, ELECTRONIC MEDIA, or COMPUTERS or to disrupt or interfere with the operations of COMPUTERS.

4.    COMPUTERS

Includes but is not limited to mainframes, servers, workstations and portable computers, personal information managers, wide and local area network hardware, electronic and electromechanical

equipment, data processing equipment, electronic controls for machinery, electronically programmed memory chips, and electronically controlled communication equipment.

5.    CONTAMINANTS OR POLLUTANTS

Any material which, after its release, can cause or threaten damage to human health or human welfare or which can cause or threaten damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, any solid, liquid, gaseous or thermal irritant or contaminant including vapor, fumes, acids, soot, alkalis, virus, chemicals and waste, or any hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the US Environmental Protection Agency.

6.    EARTH MOVEMENT

All earthquake, landslide, mudslide, mudflow, rock fall, volcanic eruption, earth sinking (other than sinkhole collapse), rising, shifting, subsidence or other earth movement, whether observable or not observable, and whether man-made or caused by natural phenomena.  EARTH MOVEMENT includes sea waves, tide or tidal waters, storm surge and spray caused by or resulting from tsunami or other tectonic or seismic activity.

7.    ELECTRONIC DATA

Facts, concepts, information, or data, including compilations thereof, in a form useable or intended for use or processing by COMPUTERS or for storage on ELECTRONIC MEDIA.  ELECTRONIC DATA includes but is not limited to files, programs, applications, operating systems, and other coded instructions for the processing, calculation and storage of facts, concepts, and information by COMPUTERS.

8.    ELECTRONIC MEDIA

Any physical device that holds, stores, contains or transfers ELECTRONIC DATA, and includes but is not limited to disks, drives, films, tapes, records, drums, or cells.

9.    EXISTING PROPERTY

Buildings or permanent structures, including equipment used to maintain or service the buildings or structures that existed prior to the beginning of construction at the INSURED PROJECT Site.

10.    FLOOD

A general and temporary condition during which the surface of normally dry land is partially or completely inundated due to:

A.    Rain and resultant runoff; or

B.    The rising, overflow or breach of any boundary of a natural or man-made body of water; or

C.    Sea waves, tide or tidal waters, storm surge, or spray from any of these, whether driven by wind or not; however, FLOOD does not include tsunami, sea waves, tide or tidal waters, storm surge or spray caused by or resulting from tectonic or seismic activity; or

D.    The failure of a cofferdam or similar structure intended to hold water back from an area of construction; or

E.    Unexpected accumulation of water caused by subsurface seepage or subsurface leakage; or

As respects piles and other insured property designed to be used in or above water and purposely placed or stationed in or above lakes, rivers, streams, harbors or other bodies of water, any direct physical LOSS

that could be deemed direct physical LOSS caused by WATER DAMAGE or direct physical LOSS caused by FLOOD under this policy, shall be deemed direct physical LOSS caused by FLOOD, and all terms and conditions herein shall apply as if the direct physical LOSS were caused by FLOOD.

FLOOD also means accumulation of water, including water that is mixed with soil, sand, rock, or other matter, in an excavation, pit or underground tunnel, shaft or pipe, or otherwise impacting construction work below grade.

11.    FUNCTIONAL REPLACEMENT COST

The cost to replace insured property with similar property intended to perform the same function when replacement with substantially identical property is impossible or unnecessary.

12.    FUNGUS

Any type or form of FUNGUS, including mold or mildew, and any mycotoxins, spores, scents, or by-products produced or released by fungi.

13.    INSURED PROJECT

The work which the NAMED INSURED is contractually obligated to perform in accordance with the contract documents, being more fully described and located as set forth on the Construction Risk Declarations.

14.    LOSS

Accidental loss or damage.

15.    MALICIOUS PROGRAMMING

An illegal or malicious entry into COMPUTERS or ELECTRONIC DATA that results in functions that distort, corrupt, manipulate, copy, delete, destroy, slow down or prevent the use of such COMPUTERS or ELECTRONIC DATA.

16.    NAMED INSURED

The persons or companies identified on the Construction Risk Declarations.

17.    NAMED WINDSTORM

An intense tropical weather system with a well-defined circulation and maximum sustained winds of at least 39 mph or 63 km/hr that is named by the National Oceanic and Atmospheric Administration (NOAA), including any of NOAA's organizations, such as the National Weather Service or the National Hurricane Center.  NAMED WINDSTORM includes any tornadoes, microbursts or any other wind event that is caused by or results from the NAMED WINDSTORM.

18.    OCCURRENCE

All LOSS attributable directly or indirectly to one originating cause, event, incident or repeated exposure to the same originating cause, event, or incident, or to one series of similar originating causes, events, incidents or repeated exposures to the same originating cause, event or incident first occurring in the Policy period. All such LOSS will be treated as one OCCURRENCE, unless a specific period of time is included in this Policy. The most the Company will pay for LOSS in any one OCCURRENCE is the applicable Limit of Insurance shown on the Construction Risk Declarations.

As respects the perils of strike, riot, civil commotion, vandalism and malicious mischief, OCCURRENCE shall mean all LOSS arising during a continuous period of seventy-two (72) hours during the term of this

Policy.  The NAMED INSURED may elect the moment when the seventy-two (72) hour period begins, but no two such periods shall overlap.  Such strike, riot, civil commotion, vandalism, or malicious mischief shall be deemed to be a single OCCURRENCE within the meaning of this Policy.

As respects the peril of EARTH MOVEMENT, OCCURRENCE shall mean all LOSS arising during a continuous period of seventy-two (72) hours during the term of this Policy.  The NAMED INSURED may elect the moment when the seventy-two (72) hour period begins, but no two such periods shall overlap.  Such EARTH MOVEMENT shall be deemed to be a single OCCURRENCE within the meaning of this Policy.

As respects the peril of FLOOD, OCCURRENCE shall mean all LOSS arising during a continuous period of seventy-two (72) hours during the term of this Policy.  The NAMED INSURED may elect the moment when the seventy-two (72) hour period begins, but no two such periods shall overlap.  Such FLOOD shall be deemed to be a single OCCURRENCE within the meaning of this Policy.

As respects the peril of NAMED WINDSTORM, OCCURRENCE shall mean all LOSS arising out of the same NAMED WINDSTORM, including any tornadoes, microbursts or any other wind event associated with that NAMED WINDSTORM.  Such NAMED WINDSTORM shall be deemed to be a single OCCURRENCE within the meaning of this Policy.

The Company shall not be liable for any such LOSS first occurring before the effective date and time or first occurring after the expiration date and time of this Policy.


19.    REPLACEMENT COST

The cost to repair or replace the insured property lost or damaged at the time and place of direct physical LOSS with material of like kind and quality.


20.    TEMPORARY STRUCTURES

Cribbing, scaffolding, shoring, fences, construction forms and other similar structures on the INSURED PROJECT site, but TEMPORARY STRUCTURES does not include construction tools, equipment, or storage structures.

21.    TESTING

Any testing utilizing production equipment with the use of feedstock or other materials for processing, or other media to simulate working conditions.

Testing does not include any start-up, commissioning, or other forms of testing of building or civil construction systems, such as electric, heating, ventilation, air conditioning, sprinklers, water piping, plumbing, gas lines, air conditioning lines, elevators, escalators, electronic tolling, life safety or lighting, or property of similar kind.

22.    TESTING PERIOD

That period beginning with the introduction into the production equipment of feedstock or other materials for processing, or similar media, or the first firing of fuel(s), whichever occurs first. The testing period shall continue thereafter whether or not such testing, commissioning or startup is continuous or intermittent and terminate on the expiration of this Policy.

23.    TOWER CRANE

A crane with a fixed vertical mast that is topped by a rotating boom and equipped with a winch for hoisting and lowering loads.

24.     TRANSMISSION AND DISTRIBUTION LINES

Transmission and distribution lines, poles, towers, and all equipment attached or affixed thereto, including supporting structures.

25.     WATER DAMAGE

All direct physical LOSS caused by water, whatever the source, except direct physical LOSS caused by or resulting from the peril of FLOOD or NAMED WINDSTORM.

# NUCLEAR, BIOLOGICAL, CHEMICAL, RADIOLOGICAL EXCLUSION ENDORSEMENT

| Named Insured<br>**Sarasota Bayside, LLC** | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>**IMC** | Policy Number<br>**I11218350 001** | Policy Period<br>**06/17/2024 to   05/17/2026** | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

**This endorsement modifies insurance provided under the following:**

**BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART**

The following exclusions are added to your Policy or Coverage Part.

This insurance does not apply to:

**A.** Loss or damage arising directly or indirectly from nuclear detonation, reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage insured against by this Policy or Coverage Part, however such nuclear detonation, reaction, nuclear radiation or radioactive contamination may have been caused. This exclusion replaces any other nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination exclusions found elsewhere in this Policy.

**B.** Loss or damage arising directly or indirectly from the dispersal, application or release of, or exposure to, chemical, radiological, or biological materials or agents, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage insured against by this Policy or Coverage Part, however such dispersal, application, release or exposure may have been caused.

**C.** If this endorsement is attached to a Commercial Inland Marine Policy or Coverage Part, the term loss or damage is changed to Loss.

**ACE 0210 (01/08)**          ©Chubb. 2016. All rights reserved.          **Page 1 of 1**

# DELAY IN OPENING ENDORSEMENT

| Named Insured<br>Sarasota Bayside, LLC | | | Endorsement Number | |
|---|---|---|---|---|
| Policy Symbol<br>IMC | Policy Number<br>I11218350 001 | Policy Period<br>06/17/2024   To   05/17/2026 | | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | | |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### CONSTRUCTION RISK COVERAGE FORM

For the purpose of this endorsement only, the NAMED INSURED if different from that stated on the Policy Declarations, shall be as shown below. There shall be no Additional Insureds hereunder, unless specifically endorsed below.

Whenever "NCP" is shown below it denotes no coverage has been purchased and no coverage is provided.  Whenever "NA" is shown below it denotes "Not Applicable" to that coverage, deductible, Sub-limit of Insurance, or other policy provision.

| NAMED INSURED: | Sarasota Bayside, LLC | | |
|---|---|---|---|
| Maximum PERIOD OF INDEMNITY: | Loss of RENTAL INCOME | 365 | Calendar Days |
| | Loss of BUSINESS INCOME | NCP | Calendar Days |
| | SOFT COSTS / ADDITIONAL EXPENSES | 365 | Calendar Days |

| SCHEDULED DATE OF COMPLETION: | | 05/17/2026 | |
|---|---|---|---|

| WAITING PERIOD: | 45 | Calendar Days, Each DELAY except; | | |
|---|---|---|---|---|
| | | A. | Each DELAY caused by or resulting from FLOOD: | 45 | Calendar Days |
| | | B. | Each DELAY caused by or resulting from EARTH MOVEMENT: | 45 | Calendar Days |
| | | C. | Each DELAY caused by or resulting from NAMED WINDSTORM: | 45 | Calendar Days |
| | | D. | Each DELAY caused by or resulting from WATER DAMAGE: | 45 | Calendar Days |
| | | E. | Each DELAY caused by or resulting from NCP: | NA | Calendar Days |

In return for the payment of premium and subject to all the terms and conditions of this Policy and individual Sub-limits of Insurance shown below, the total Sub-limit of Insurance for which the Company shall be liable under this endorsement per OCCURRENCE and in the Aggregate shall not exceed $19,473,969. These Sub-limits of Insurance are part of and not in addition to the Limit of Insurance Per OCCURRENCE stated on the Policy Declarations.

| 1. | Loss of RENTAL INCOME | $ | 7,864,311 | Monthly Limit of Indemnity | $ | 655,359 |
|---|---|---|---|---|---|---|
| 2. | Loss of BUSINESS INCOME | $ | NCP | Monthly Limit of Indemnity | $ | NA |
| 3. | SOFT COSTS /  ADDITIONAL EXPENSES | $ | 11,609,658 | Monthly Limit of Indemnity | $ | NA |
| | Refer to Individual Sub-limits below: | | | | | |
| | Interest Expense on CONSTRUCTION LOAN(s); | $ | 6,400,000 | Monthly Limit of Indemnity | $ | NA |
| | Advertising and promotional expense; | $ | 63,000 | Monthly Limit of Indemnity | $ | NA |
| | Legal and accounting fees; | $ | 112,500 | Monthly Limit of Indemnity | $ | NA |

| | | | | | |
|---|---|---|---|---|---|
| Commissions incurred upon the Renegotiation of leases; | $ | NCP | Monthly Limit of Indemnity | $ | NA |
| Fees for licenses and permits; | $ | 198,175 | Monthly Limit of Indemnity | $ | NA |
| Insurance premiums for Builders Risk, Workers' Compensation and General Liability Insurance; | $ | 1,203,947 | Monthly Limit of Indemnity | $ | NA |
| Real Estate taxes and assessments; | $ | 243,413 | Monthly Limit of Indemnity | $ | NA |
| Project Administration Expense,excluding developer fees and project resequencing costs; | $ | NCP | Monthly Limit of Indemnity | $ | NA |
| Other: Architectural and Engineering Fees; | $ | 820,101 | Monthly Limit of Indemnity | $ | NA |
| Other: Development Fee ; | $ | 974,210 | Monthly Limit of Indemnity | $ | NA |
| Other: Other Development Costs ; | $ | 435,193 | Monthly Limit of Indemnity | $ | NA |
| Other: Financing Fees ; | $ | 500,000 | Monthly Limit of Indemnity | $ | NA |
| Other: Contingency on the above SOFT COSTS / ADDITIONAL EXPENSES; | $ | 659,119 | Monthly Limit of Indemnity | $ | NA |

## INSURING AGREEMENT

1.  Subject to all terms, conditions, limitations and exclusions of this Endorsement, and of the Policy to which it is attached, the Company will pay the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained during the PERIOD OF INDEMNITY as a result of a DELAY in completion of the INSURED PROJECT described on the Policy Declarations, or as amended by Endorsement, when such DELAY is caused by an OCCURRENCE or series of OCCURRENCE(S), resulting in physical LOSS to insured property by an insured peril.

    The Company shall also indemnify the NAMED INSURED for extra expenses during the PERIOD OF INDEMNITY that are necessarily incurred for the purpose of reducing any loss amount under this endorsement, but only to the extent that such loss amount otherwise payable under this endorsement is thereby reduced.

2.  **Civil Authority**
    The Company will pay the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained as a result of a DELAY in completion of the INSURED PROJECT, caused by action of civil authority that prohibits access to the INSURED PROJECT site stated on the Policy Declarations due to direct physical LOSS to property, other than at the INSURED PROJECT site stated on the Policy Declarations, caused by or resulting from an insured peril. This coverage will apply for a period of up to thirty (30) consecutive days after the application of the WAITING PERIOD.

3.  **Ingress / Egress**
    The Company will pay the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained as a result of a DELAY in completion of the INSURED PROJECT, caused by an insured peril that prohibits access to the INSURED PROJECT site stated on the Policy Declarations due to direct physical LOSS to property, other than at the INSURED PROJECT site stated on the Policy Declarations. This coverage will apply for a period of up to thirty (30) consecutive days after the application of the WAITING PERIOD.

4.  **Utility Interruption**
    The Company will pay for the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained as a result of a DELAY in completion of the INSURED PROJECT caused by loss of electrical, steam, gas, water, sewer, telephone, or any other utility or service, situated on or within two (2) statute miles to the INSURED PROJECT site due to direct physical LOSS caused by an insured peril. This coverage will apply for a period of up to thirty (30) consecutive days after the application of the WAITING PERIOD.

5.   **Ordinance or Law**

The Company will pay for the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained as a result of a DELAY in completion of the INSURED PROJECT caused by the enforcement of any ordinance or law regulating construction, rebuilding, repair, removal or reconstruction of the work at the INSURED PROJECT site due direct physical LOSS to insured property caused by or resulting from an insured peril.  This coverage will apply for a period of up to thirty (30) consecutive days after the application of the WAITING PERIOD.

This coverage only applies as respects Ordinance or Law in effect at the time of direct physical LOSS and if the Ordinance or Law extension of coverage is purchased and a Sub-limit of Insurance is stated on the Declarations.

## WAITING PERIOD

1.   The coverage provided by this endorsement applies to each DELAY that exceeds the WAITING PERIOD, and only for such part of that DELAY that is in excess of this period.

2.   In the event that more than one WAITING PERIOD shall apply to the coverage provided by this endorsement, only the longest WAITING PERIOD shall be applied.

3.   The WAITING PERIOD of this endorsement applies independently and shall not be combined with any deductible that applies to physical LOSS covered by this Policy.

## ADDITIONAL EXCLUSIONS

The Company shall not be liable for any increase in DELAY caused by or resulting from:

1.   LOSS to property not insured by this policy.
2.   Alterations, additions, improvements or other changes made in the design, plans, specifications or other contract documents for the INSURED PROJECT which are required to effect the repair or replacement of the damaged property.
3.   The unavailability of funds for the repair or replacement of lost or damaged property.
4.   Import, export or customs restrictions and/or regulations.
5.   Breach of contract, late or non-completion of orders and/or suspension, lapse or cancellation of any lease or purchase order.
6.   Failure of the NAMED INSURED or any Additional Insureds to obtain, maintain or extend any permit, lease, license or purchase order commitments.
7.   Failure of the NAMED INSURED or any Additional Insureds to use due diligence and dispatch in restoring the damaged property to the condition existing prior to the LOSS.
8.   Interference with the INSURED PROJECT by strikers or other persons with the transportation of property, the construction, rebuilding, repairing or replacing of insured property hereunder or the occupancy and use of the premises.
9.   Consequential damages including liquidated damages, performance or non-performance penalties, penalties for non-completion or non-compliance with contract conditions.
10.  Any deviation from the original SCHEDULED DATE OF COMPLETION or revisions thereto, and which is independent of an insured LOSS which gives rise to a DELAY, whether occurring prior to or after an OCCURRENCE.

## GENERAL CONDITIONS

1.   The NAMED INSURED shall furnish in writing, as often as required by the Company, progress reports on the INSURED PROJECT, except the NAMED INSURED shall immediately advise the Company in writing of any change which is likely to affect the SCHEDULED DATE OF COMPLETION.  In the event a difference between the anticipated and actual progress of the work necessitates revision of the SCHEDULED DATE OF COMPLETION, the Company and the NAMED INSURED shall agree to a revised SCHEDULED DATE OF COMPLETION which will be endorsed to this Policy. The NAMED INSURED shall then establish a revised progress schedule for the work which will be the basis of comparison with future progress reports.  In the event of any further differences between the

revised progress schedule and progress reports, similar revision(s) in the progress schedule will be made and a revised SCHEDULED DATE OF COMPLETION will be endorsed to this Policy.

Revisions to the SCHEDULED DATE OF COMPLETION will not be made as a result of insured LOSS(es).

In no case will the revised SCHEDULED DATE OF COMPLETION be earlier than the original SCHEDULED DATE OF COMPLETION shown hereon.

2.  It is a condition precedent to coverage under this endorsement that the NAMED INSURED shall make every reasonable attempt to minimize the amount of any LOSS by:

    A.  Making complete or partial use of covered or other property at the location of the INSURED PROJECT or other location; and/or

    B.  Make use of other machinery, equipment or supplies; and/or

    C.  Minimize the extent of any interference with the construction schedule so as to avoid or diminish any DELAY.

3.  The Company shall not be liable during the PERIOD OF INDEMNITY for more than the amount stated on Page 1 of this Endorsement.

4.  At the end of the first month of the PERIOD OF INDEMNITY and monthly thereafter, if it is possible for the Company to determine the minimum amount of loss payable under this endorsement for the elapsed period, the Company shall pay such amount(s) to the NAMED INSURED as an installment of the total loss.

5.  The Company shall have the right, but not the duty to conduct an audit of the NAMED INSURED's records twelve months after actual commencement of operations to determine the loss as defined by this Endorsement, as well as any expenses related to reducing loss incurred by the NAMED INSURED. Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the DELAY not occurred, so that the amount thus adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the DELAY, would have been realized. Any amount saved in respect of labor costs, charges and expenses that have ceased or reduced during the PERIOD OF INDEMNITY and liquidated damage the NAMED INSURED is entitled to receive, whether collectible or not, shall be deducted from the loss during the PERIOD OF INDEMNITY.

6.  If the amount of loss determined by any audit conducted by the Company is less than or exceeds the sum paid by the Company during the PERIOD OF INDEMNITY, the difference between the two amounts shall be paid by or to the Company as the case may be.

7.  Upon request by the Company, the NAMED INSURED shall make available all records and information relevant to the coverage provided by this endorsement.

8.  It is a condition of this insurance that the NAMED INSURED shall begin normal operations as soon as practical.

## DEFINITIONS

For purposes of this endorsement, the following definitions shall apply in addition to those set forth in the Policy:

1.  BUSINESS INCOME

    The amount not realized by the NAMED INSURED during the PERIOD OF INDEMNITY which would have been earned from the commencement of operations or use and occupancy of the work if the DELAY had not occurred, consisting of;
    The sum of:

    A.  The net profit or loss (before income taxes), and;

    B.  The continuing normal operating expenses, including payroll.

2.  CONSTRUCTION LOANS

Written agreements under which the NAMED INSURED borrows money from a Lender for the sole purpose of funding construction, fabrication, assembly, installation, erection or alteration of INSURED PROJECTS under this Policy. For the purpose of this clause, "Lender" means a third party that is not affiliated with or related to the NAMED INSURED and is a financial institution licensed or authorized to lend money under applicable federal or state law.

The following are not CONSTRUCTION LOANS under this Policy:
A.  Financial allocations among parent companies, affiliates and subsidiaries of the NAMED INSURED;
B.  Internal financing between parent companies, affiliates and subsidiaries of the NAMED INSURED; and
C.  Loans made to the NAMED INSURED by a parent, affiliate or subsidiary of the NAMED INSURED.

3.  DELAY

The period of time between the SCHEDULED DATE OF COMPLETION and the actual date on which commercial operations or use and occupancy can commence with the exercise of due diligence and dispatch.

4.  PERIOD OF INDEMNITY

The period of time that begins immediately following the SCHEDULED DATE OF COMPLETION for the INSURED PROJECT which is in excess of the WAITING PERIOD and ending the earlier of:

A.  The applicable number of days shown on page 1 of this Endorsement for the Maximum PERIOD OF INDEMNITY; or

B.  The actual date on which the commercial operations or use and occupancy can commence with the exercise of due diligence and dispatch.

The PERIOD OF INDEMNITY for any insured DELAY hereunder shall not be limited or otherwise affected by the expiration, cancellation or termination of this the Policy.

5.  RENTAL INCOME

Revenues from rentals and leases not realized during the PERIOD OF INDEMNITY, which would have been earned by the NAMED INSURED if the DELAY had not occurred, less non-continuing expenses.

6.  SCHEDULED DATE OF COMPLETION

The later of the completion date scheduled in the construction contract and stated on Page 1 of this Endorsement, or the date the INSURED PROJECT would have been completed for commencement of c commercial operations or use and occupancy if a LOSS had not occurred.

7.  SOFT COSTS/ADDITIONAL EXPENSES
Expenditures which are necessarily incurred during the PERIOD OF INDEMNITY, which would not have been incurred by the NAMED INSURED if the DELAY had not occurred, including:

A.  Interest Expense on CONSTRUCTION LOAN(s);

B.  Advertising and promotional expense;

C.  Legal and accounting fees;

D.  Commissions incurred upon renegotiation of leases;

E.  Fees for licensing and permits;

F.  Insurance premiums for Builders Risk, Workers' Compensation and General Liability Insurance;

G.  Real estate taxes and assessments;

 Copyright 2021

H.    Project Administration Expense, excluding developer fees and project resequencing costs;

I.    Other, as accepted by the Company and scheduled on this Endorsement.

8.    WAITING PERIOD

The number of calendar days per OCCURRENCE stated on Page 1 of this Endorsement, beginning with the later of the SCHEDULED DATE OF COMPLETION or the date the INSURED PROJECT could have been completed had there been no LOSS.

All other terms and conditions remain unchanged.

Copyright 2021

## ORDINANCE OR LAW COVERAGE ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| **Sarasota Bayside, LLC** | |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| **IMC** | **I11218350 001** | **06/17/2024 to   05/17/2026** | |

| Issued By (Name of Insurance Company) |
|---|
| **ACE American Insurance Company** |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### CONSTRUCTION RISK COVERAGE FORM

**PART C EXTENSIONS OF COVERAGE**, Item 15 is deleted in its entirety and replaced by the following:

15.  Ordinance or Law

If the repair of direct physical LOSS to insured property caused by an insured peril becomes subject to the enforcement of any ordinance or law that is in force at the time of direct physical LOSS and that:

A.   Requires the demolition of parts of the undamaged insured property; or

B.   Regulates the construction or repair of damaged insured property;

then the Company will pay up to the Sub-limits of Insurance stated below for:

COVERAGE 1:  The value of such undamaged part of the insured property which must be demolished;

COVERAGE 2:  The cost of demolishing the undamaged insured property and clearing the site of debris from such demolition;

COVERAGE 3:  The increased cost of repair and/or reconstruction of the damaged and undamaged insured property on the same site and limited to the minimum requirements of such ordinance or law regulating the repair or reconstruction of the damaged insured property on the same site.  However, the Company will not pay for any increased cost of repair or reconstruction unless the damaged insured property is actually rebuilt or replaced.

The Company will not pay the following costs:

i.   Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating asbestos or other hazardous material;

ii.   Cost of any governmental direction or request declaring that asbestos or other hazardous material present in, part of or utilized on any damaged or undamaged portion of insured property that can no longer be used for the purpose for which it was intended or installed and must be removed, modified or abated.

iii.   Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating CONTAMINANTS OR POLLUTANTS; or

iv.   Cost of compliance with the enforcement of any ordinance or law which the NAMED INSURED or owner would have otherwise been required to comply by nature of such ordinance or law in the absence of any direct physical LOSS covered by this Policy.

 ©Chubb. 2016. All rights reserved.

**Sub-limits of Insurance**

These Sub-limits of Insurance are part of and not in addition to the Limit of Insurance per OCCURRENCE stated on the Declarations.

COVERAGE 1          $107,556,327

COVERAGE 2          $10,000,000

COVERAGE 3          $10,000,000

All Ordinance or Law Coverages in any one OCCURRENCE $107,556,327

All other terms and conditions remain unchanged.

©Chubb. 2016. All rights reserved.



## AMENDMENT TO EXCLUDED CAUSES OF LOSS - COST OF MAKING GOOD

| Named Insured<br>Sarasota Bayside, LLC | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>IMC | Policy Number<br>I11218350 001 | Policy Period<br>06/17/202    to    05/17/2026 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### CONSTRUCTION RISK COVERAGE FORM

**PART D EXCLUSIONS**, Excluded Causes of LOSS, subpart **III. Cost of Making Good** is deleted in its entirety and replaced by the following:

**III. Cost of Making Good:**

This Policy does not insure the costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the LOSS:

A.   Fault, defect, error, deficiency or omission in design, plans, specifications, engineering or surveying;

B.   Faulty or defective workmanship, supplies or material;

However, if direct physical LOSS by an insured peril ensues, then this Policy will provide cover for such ensuing LOSS to insured property, including the damaged insured property that was faulty or defective. However, under no circumstances will this policy cover the costs to improve or redesign the original design, plans, specifications, engineering, surveying, workmanship, supplies or material.

For the purpose of this Policy and not merely this Excluded Cause of LOSS, insured property, or any portion thereof, shall not be regarded as damaged solely by virtue of the existence of any condition stated under A. or B. above.

The deductible applicable to this endorsement is $250,000 per OCCURRENCE.

The premium charge for this endorsement is $Included which is included in the premium stated on the Declarations.

All other terms and conditions remain unchanged.

_____
Authorized Representative



# FLOOD AND NAMED WINDSTORM DEFINITIONS ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| **Sarasota Bayside, LLC** | |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| **IMC** | **I11218350 001** | **06/17/2024** To **05/17/2026** | |

| Issued By (Name of Insurance Company) | |
|---|---|
| **ACE American Insurance Company** | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### CONSTRUCTION RISK COVERAGE FORM

It is agreed that **PART F DEFINTIONS** is amended as follows:

a.   Items 10. FLOOD and 17. NAMED WINDSTORM are deleted and replaced by the following:

10.   FLOOD

A general and temporary condition during which the surface of normally dry land is partially or completely inundated due to:

A.   Rain and resultant runoff; or

B.   The rising, overflow or breach of any boundary of a natural or man-made body of water; or

C.   Sea waves, tide or tidal waters, storm surge, or spray from any of these, whether driven by wind or not; however, FLOOD does not include tsunami, sea waves, tide or tidal waters, storm surge, or spray caused by or resulting from tectonic or seismic activity; or

D.   The failure of a cofferdam or similar structure intended to hold water back from an area of construction; or

E.   Unexpected accumulation of water caused by subsurface seepage or subsurface leakage.

As respects piles and other insured property designed to be used in or above water and purposely placed or stationed in or above lakes, rivers, streams, harbors or other bodies of water, any direct physical LOSS that could be deemed direct physical LOSS caused by WATER DAMAGE or direct physical LOSS caused by FLOOD under this policy, shall be deemed LOSS caused by FLOOD, and all terms and conditions herein shall apply as if the direct physical LOSS were caused by FLOOD.

FLOOD also means accumulation of water, including water that is mixed with soil, sand, rock, or other matter, in an excavation, pit or underground tunnel, shaft or pipe, or otherwise impacting construction work below grade.

FLOOD does not include NAMED WINDSTORM FLOOD.

17.   NAMED WINDSTORM

An intense tropical weather system with a well-defined circulation and maximum sustained winds of at least 39 mph or 63 km/hr that is named by the National Oceanic and Atmospheric Administration (NOAA), including any of NOAA's organizations, such as the National Weather Service or the National Hurricane Center.  NAMED WINDSTORM includes any tornadoes, microbursts or other wind event that is caused by or results from the NAMED WINDSTORM.

NAMED WINDSTORM includes NAMED WINDSTORM FLOOD.

CHUBB®

b.   The following is added:

26.  NAMED WINDSTORM FLOOD

FLOOD directly caused by or resulting from a NAMED WINDSTORM.

All other terms and conditions remain unchanged.

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured<br>**Sarasota Bayside, LLC** | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>**IMC** | Policy Number<br>**I11218350 001** | Policy Period<br>**06/17/2024 to  05/17/2026** | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, but not limited to, the payment of claims.  All other terms and conditions of policy remain unchanged.

_____
                                                          Authorized Agent

ALL-21101 (11-06) Ptd. In U.S.A.

COMMERCIAL INLAND MARINE
CM 01 16 02 12

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART

**A.** Paragraph **5.** of Loss Condition **E. Loss Payment** in the Commercial Inland Marine Conditions is replaced by the following:

**5.** Provided you have complied with all the terms of this Coverage Part, we will pay for covered loss or damage within:

**a.** 20 days after we receive the sworn proof of loss and reach written agreement with you; or

**b.** 30 days after we receive the sworn proof of loss and:

**(1)** There is an entry of final judgment; or

**(2)** There is a filing of an appraisal award with us.

Paragraph **A.** does not apply to the Mail Coverage Form.

**B.** The following provisions are added to Loss Condition **C. Duties In The Event Of Loss** in the Commercial Inland Marine Conditions:

**1.** A claim, supplemental claim or reopened claim for loss or damage caused by hurricane or other windstorm is barred unless notice of claim is given to us in accordance with the terms of this Coverage Part within three years after the hurricane first made landfall or a windstorm other than hurricane caused the covered damage. (Supplemental claim or reopened claim means an additional claim for recovery from us for losses from the same hurricane or other windstorm which we have previously adjusted pursuant to the initial claim.)

This provision concerning time for submission of claim, supplemental claim or reopened claim does not affect any limitation for legal action against us as provided in this Coverage Part under the Legal Action Against Us Condition, including any amendment to that condition.

**2.** Any inspection or survey by us, or on our behalf, of property that is the subject of a claim, will be conducted with at least 48 hours' notice to you. The 48-hour notice may be waived by you.

IL 01 75 09 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES – LEGAL ACTION AGAINST US

This endorsement modifies insurance provided under the following:

> CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> EQUIPMENT BREAKDOWN COVERAGE PART
> FARM COVERAGE PART

The following replaces the second paragraph of the **Legal Action Against Us** Condition:

**LEGAL ACTION AGAINST US**

Legal action against us involving direct physical loss or damage to property must be brought within 5 years from the date the loss occurs.

© ISO Properties, Inc., 2006
☐

IL 02 55 04 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2. Cancellation For Policies In Effect 90 Days Or Less**

**a.** If this policy has been in effect for 90 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, accompanied by the specific reasons for cancellation, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 20 days before the effective date of cancellation if we cancel for any other reason, except we may cancel immediately if there has been:

**(a)** A material misstatement or misrepresentation; or

**(b)** A failure to comply with underwriting requirements established by the insurer.

**b.** However, Paragraph **2.a.(2)** does not apply to a first Named Insured whose residential structure has been insured by us or an affiliated insurer for at least a five-year period immediately prior to the date of written notice. Instead, refer to Paragraph **C.7.b.(4)** of this endorsement.

**c.** We may not cancel:

**(1)** On the basis of property insurance claims that are the result of an act of God, unless we can demonstrate, by claims frequency or otherwise, that you have failed to take action reasonably necessary as requested by us to prevent recurrence of damage to the insured property; or

**(2)** Solely on the basis of a single property insurance claim which is the result of water damage, unless we can demonstrate that you have failed to take action reasonably requested by us to prevent a future similar occurrence of damage to the insured property.

**B.** Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect, unless this is an audit policy.

© Insurance Services Office, Inc., 2014

If this is an audit policy, then, subject to your full cooperation with us or our agent in securing the necessary data for audit, we will return any premium refund due within 90 days of the date cancellation takes effect. If our audit is not completed within this time limitation, then we shall accept your own audit, and any premium refund due shall be mailed within 10 working days of receipt of your audit.

The cancellation will be effective even if we have not made or offered a refund.

**C.** The following is added to the **Cancellation** Common Policy Condition:

    **7. Cancellation For Policies In Effect For More Than 90 Days**

        **a.** If this policy has been in effect for more than 90 days, we may cancel this policy only for one or more of the following reasons:

            **(1)** Nonpayment of premium;

            **(2)** The policy was obtained by a material misstatement;

            **(3)** There has been a failure to comply with underwriting requirements established by us within 90 days of the effective date of coverage;

            **(4)** There has been a substantial change in the risk covered by the policy;

            **(5)** The cancellation is for all insureds under such policies for a given class of insureds;

            **(6)** On the basis of property insurance claims that are the result of an act of God, if we can demonstrate, by claims frequency or otherwise, that you have failed to take action reasonably necessary as requested by us to prevent recurrence of damage to the insured property;

            **(7)** On the basis of a single property insurance claim which is the result of water damage, if we can demonstrate that you have failed to take action reasonably requested by us to prevent a future similar occurrence of damage to the insured property; or

            **(8)** The cancellation of some or all of our policies is necessary to protect the best interests of the public or policyholders and such cancellation is approved by the Florida Office of Insurance Regulation.

        **b.** If we cancel this policy for any of these reasons, we will mail or deliver to the first Named Insured written notice of cancellation, accompanied by the specific reasons for cancellation, at least:

            **(1)** 10 days before the effective date of cancellation if cancellation is for nonpayment of premium;

            **(2)** 45 days before the effective date of cancellation if:

                **(a)** Cancellation is for one or more of the reasons stated in Paragraphs **7.a.(2)** through **7.a.(7)** above, and this policy does not cover a residential structure or its contents; or

                **(b)** Cancellation is based on the reason stated in Paragraph **7.a.(8)** above;

            **(3)** 100 days before the effective date of cancellation if:

                **(a)** Cancellation is for one or more of the reasons stated in Paragraphs **7.a.(2)** through **7.a.(7)** above; and

                **(b)** This policy covers a residential structure or its contents, unless Paragraph **7.b.(4)** applies.

                However, if cancellation is to become effective between June 1 and November 30, we will mail or deliver to the first Named Insured written notice of cancellation at least 100 days prior to the effective date of cancellation or by June 1, whichever is earlier. Therefore, when cancellation is to become effective between September 9 and November 30, we will mail or deliver to the first Named Insured written notice of cancellation by June 1; or

            **(4)** 120 days before the effective date of cancellation if:

                **(a)** Cancellation is for one or more of the reasons stated in Paragraphs **7.a.(2)** through **7.a.(7)** above; and

                **(b)** The first Named Insured's residential structure has been insured by us or an affiliated insurer for at least a five-year period immediately prior to the date of the written notice.

        **c.** If this policy has been in effect for more than 90 days and covers a residential structure or its contents, we may not cancel this policy based on credit information available in public records.

**D.** The following is added:

**Nonrenewal**

1. If we decide not to renew this policy, we will mail or deliver to the first Named Insured written notice of nonrenewal, accompanied by the specific reason for nonrenewal, at least:

   **a.** 45 days prior to the expiration of the policy if this policy does not cover a residential structure or its contents, or if nonrenewal is for the reason stated in Paragraph **D.5.;** or

   **b.** 100 days prior to the expiration of the policy if this policy covers a residential structure or its contents, unless Subsection **c.** or **d.** applies.

   **c.** If this policy covers a residential structure or its contents and nonrenewal is to become effective between June 1 and November 30, we will mail or deliver to the first Named Insured written notice of nonrenewal at least 100 days prior to the effective date of nonrenewal or by June 1, whichever is earlier. Therefore, when nonrenewal is to become effective between September 9 and November 30, we will mail or deliver to the first Named Insured written notice of nonrenewal by June 1. If nonrenewal is due to a revision to this policy's coverage for sinkhole losses or catastrophic ground cover collapse, pursuant to section 627.706, Florida Statutes, then this subsection, **c.,** does not apply. Therefore, in such a case, Subsection **b.** or **d.** applies.

   **d.** 120 days prior to the effective date of nonrenewal if the first Named Insured's residential structure has been insured by us or an affiliated insurer for at least a five-year period immediately prior to the date of the written notice.

2. Any notice of nonrenewal will be mailed or delivered to the first Named Insured at the last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

3. We may not refuse to renew this policy:

   **a.** On the basis of property insurance claims that are the result of an act of God, unless we can demonstrate, by claims frequency or otherwise, that you have failed to take action reasonably necessary as requested by us to prevent recurrence of damage to the insured property;

   **b.** On the basis of filing of claims for sinkhole loss. However, we may refuse to renew this policy if:

      **(1)** The total of such property insurance claim payments for this policy equals or exceeds the policy limits in effect on the date of loss for property damage to the covered building; or

      **(2)** You have failed to repair the structure in accordance with the engineering recommendations upon which any loss payment or policy proceeds were based; or

   **c.** Solely on the basis of a single property insurance claim which is the result of water damage, unless we can demonstrate that you have failed to take action reasonably requested by us to prevent a future similar occurrence of damage to the insured property.

4. Notwithstanding the provisions of Paragraph **D.3.,** we may refuse to renew this policy if this policy includes Sinkhole Loss coverage. If we nonrenew this policy for purposes of removing Sinkhole Loss coverage, pursuant to section 627.706, Florida Statutes, we will offer you a policy that includes catastrophic ground cover collapse coverage.

5. Notwithstanding the provisions of Paragraph **D.3.,** we may refuse to renew this policy if nonrenewal of some or all of our policies is necessary to protect the best interests of the public or policyholders and such nonrenewal is approved by the Florida Office of Insurance Regulation.

**E. Limitations On Cancellation And Nonrenewal In The Event Of Hurricane Or Wind Loss – Residential Property**

1. The following provisions apply to a policy covering a residential structure or its contents, if such property has sustained damage as a result of a hurricane or windstorm that is the subject of a declaration of emergency by the Governor and filing of an order by the Commissioner of Insurance Regulation:

   **a.** Except as provided in Paragraph **E.1.b.,** we may not cancel or nonrenew the policy until at least 90 days after repairs to the residential structure or its contents have been substantially completed so that it is restored to the extent that it is insurable by another insurer writing policies in Florida. If we elect to not renew the policy, we will provide at least 100 days' notice that we intend to nonrenew 90 days after the substantial completion of repairs.

© Insurance Services Office, Inc., 2014

**b.** We may cancel or nonrenew the policy prior to restoration of the structure or its contents for any of the following reasons:

   **(1)** Nonpayment of premium;

   **(2)** Material misstatement or fraud related to the claim;

   **(3)** We determine that you have unreasonably caused a delay in the repair of the structure; or

   **(4)** We have paid the policy limits.

If we cancel or nonrenew for nonpayment of premium, we will give you 10 days' notice. If we cancel or nonrenew for a reason listed in Paragraph **b.(2), b.(3)** or **b.(4),** we will give you 45 days' notice.

**2.** With respect to a policy covering a residential structure or its contents, any cancellation or nonrenewal that would otherwise take effect during the duration of a hurricane will not take effect until the end of the duration of such hurricane, unless a replacement policy has been obtained and is in effect for a claim occurring during the duration of the hurricane. We may collect premium for the period of time for which the policy period is extended.

**3.** With respect to Paragraph **E.2.,** a hurricane is a storm system that has been declared to be a hurricane by the National Hurricane Center of the National Weather Service (hereafter referred to as NHC). The hurricane occurrence begins at the time a hurricane watch or hurricane warning is issued for any part of Florida by the NHC and ends 72 hours after the termination of the last hurricane watch or hurricane warning issued for any part of Florida by the NHC.

IL 09 52 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

© Insurance Services Office, Inc., 2015

# CHUBB®

Sarasota Bayside, LLC
_____
Policyholder

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended, the definition of act of terrorism has changed.  As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury---in consultation with the Secretary of Homeland Security, and the Attorney General of the United States---to be an act of terrorism; to be a  violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of  certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.  Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended.   However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events.   Under the formula, the United States Government generally reimburses 80%  of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.


The portion of your term premium that is attributable to coverage for acts of terrorism is $14,084.00, and does not include any charges for the portion of losses covered by the United States government under the Act.

**C H U B B®**

## EXCLUSION OF LOSS DUE TO VIRUS, BACTERIA OR MICROORGANISM
## THAT INDUCE PHYSICAL DISTRESS, ILLNESS OR DISEASE

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **Sarasota Bayside, LLC** | | | |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| **IMC** | **I11218350 001** | **06/17/2024 to 05/17/2026** | |

| Issued By (Name of Insurance Company) |
|---|
| **ACE American Insurance Company** |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:
### CONSTRUCTION RISK COVERAGE FORM

### HOMEBUILDERS XTRA COVERAGE FORM

The following exclusion is added to this Policy; supersedes any term, provision or endorsement to the contrary in this Policy; and applies notwithstanding such term, provision or endorsement:

This Policy excludes any and all LOSS, damage, cost, or expense of any nature whatsoever directly or indirectly caused by or resulting from the following, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence thereto:

Any virus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease, or the fear or threat (whether actual or perceived) of any such virus, bacteria or microorganism, including any and all LOSS directly or indirectly caused by any action or inaction of the Insured or any action or order of a government undertaken in response to, or intended to detect, control, prevent, suppress, mitigate or remediate, the actual, suspected, or anticipated presence of any virus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease.

This exclusion does not apply to LOSS or damage caused by or resulting from moss or FUNGUS (including mold and mildew), or any mycotoxins, spores, scents, or other by-products of fungi, if such LOSS or damage, including any exclusion thereof, is addressed in a separate provision elsewhere in this Policy.

This exclusion supersedes any exclusion relating to CONTAMINANTS OR POLLUTANTS.

Other Policy provisions excluding coverage of loss due to virus, bacteria, or microorganism of a type other than that which induce or are capable of inducing physical distress, illness or disease remain in full force and effect.

All other terms and conditions remain unchanged.



## EXCLUSIONS – LOSS, DAMAGE OR EXPENSE ARISING FROM WATER BELOW THE SURFACE OF THE GROUND

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Sarasota Bayside, LLC | | | |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| IMC | I11218350 001 | 06/17/2024 to 05/17/2026 | |
| Issued By (Name of Insurance Company) | | | |
| ACE American Insurance Company | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

### CONSTRUCTION RISK COVERAGE FORM

**This Policy does not insure LOSS caused directly or indirectly by any of the following, and such LOSS is excluded regardless of any other cause or event that contributes concurrently, or in sequence to the LOSS:**

1. Expenses incurred for dewatering the INSURED PROJECT even if the quantities of water originally expected are exceeded substantially. However, if the peril of FLOOD is insured hereunder, this exclusion shall not apply to that water directly attributable to the peril of FLOOD;

2. Breakdown, failure or insufficient capacity of the dewatering system;

3. Expenses incurred for additional installations and facilities for the discharge of run-off or underground water;

4. Expenses incurred for the repair of cracks in any concrete and LOSS or damage due to leakage therefrom, except that which results from a peril otherwise insured against herein;

5. Expenses incurred for the repair or replacement of eroded excavation walls;

6. Subsidence if caused by insufficient or improper compacting;

7. Expenses incurred for additional sealing or waterproofing; or

8. Pressure exerted by ground water on excavation walls, shoring, floor slabs, footings, foundations or other portions of the INSURED PROJECT below grade.


All other terms and conditions remain unchanged.



## PILING WORKS EXCLUSION ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Sarasota Bayside, LLC | | | |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| IMC | I11218350 001 | 06/17/2024 to 05/17/2026 | |
| Issued By (Name of Insurance Company) | | | |
| ACE American Insurance Company | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

### CONSTRUCTION RISK COVERAGE FORM

In **PART D EXCLUSIONS,** <u>**EXCLUDED CAUSES OF LOSS,**</u> section **I.** the following is added:

The cost of repair, replacement or rectification of any:

A.  Foundation piles, casings or sheet pile construction which are:

    1.  Misplaced or misaligned;

    2.  Lost or damaged during driving or extraction; or

    3.  The subject of individual or block disconnection or declutching;

B.  Abandoned piling work, unless such abandonment is a direct result of other physical LOSS that resulted from an insured peril;

C.  Piling work necessitated by leakage or infiltration of fluids or material at seams, joints, connections or beneath sheet pile constructions or into casings, unless such leakage or infiltration is a direct result of other physical LOSS that resulted from an insured peril; or

D.  Piles that have failed to pass a loads test or to reach the required bearing load, unless such failure is a direct result of other physical LOSS that resulted from an insured peril.


All other terms and conditions remain unchanged.



**Chubb Producer Compensation
Practices & Policies**

Chubb believes that policyholders should have access to information about Chubb's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our website at http://www.chubbproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.



# Questions About Your Insurance?

Answers to questions about your insurance, coverage information, or assistance in resolving complaints can be obtained by calling Chubb, Customer Support Service Department, at 1-800-352-4462.

ALL-5X45 (11/96) Ptd. in U.S.A.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

    © ISO Properties, Inc.,  2004

CHUBB®

## WATER DAMAGE DEDUCTIBLE ENDORSEMENT

| Named Insured<br>**Sarasota Bayside, LLC** | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>**IMC** | Policy Number<br>**I11218350 001** | Policy Period<br>**06/17/2024** to **05/17/2026** | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:
### CONSTRUCTION RISK DECLARATIONS

The policy is amended as follows:

Under section **IV. Deductibles**, item C. is deleted in its entirety and replaced with the following:

   C.   LOSS in any one OCCURRENCE caused by or resulting from WATER DAMAGE:

      $250,000 per OCCURRENCE deductible as respects the first LOSS;

      $500,000 per OCCURRENCE deductible as respects the second LOSS and all subsequent LOSS(ES).

All other terms and conditions remain unchanged.

_____
Authorized Representative



# DEPOSIT PREMIUM INSTALLMENT PAYMENTS ENDORSEMENT

| Named Insured<br>Sarasota Bayside, LLC | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>IMC | Policy Number<br>I11218350 001 | Policy Period<br>06/17/2024 **to** 05/17/2026 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**CONSTRUCTION RISK COVERAGE FORM**

The following terms and conditions are hereby added to this policy, supersede any term or condition to the contrary in this policy, and apply notwithstanding such contrary terms or conditions:

The total deposit premium in the amount of ███████ shall be paid in ███ installments as follows:

Installment Due Date                     Installment Premium

Place an "X" in the applicable blank:

☒   Any endorsement with an additional or return premium issued after the inception date shall be paid in full as of the effective date of the endorsement.

☐   The additional or return premium for any endorsement issued after the inception date will be added or subtracted from the installments beginning in the subsequent to the effective date of the endorsement.

All other terms and conditions remain unchanged.



# Claims Directory
# Property and Inland Marine

**Claims or Loss Notices related to this policy should be reported to the following:**

| Claim Office | Email and Fax | Location |
|---|---|---|
| Chubb North American Claims | First Notices Email: ChubbClaimsFirstNotice@Chubb.com<br><br>First Notices Fax:<br>    (877)-395-0131 (Toll Free)<br>    (302)-476-7254 (Local)<br><br>Phone:<br>    (800)-433-0385 - Business Hours<br>    (800)-523-9254 – After Hours | P.O. Box 5122<br>Scranton, PA<br>18505-0554 |

 ©Chubb. 2016. All rights reserved.

**CHUBB**®

# SIGNATURES

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **Sarasota Bayside, LLC** | | | |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **IMC** | **I11218350 001** | **06/17/2024 to 05/17/2026** | |
| Issued By (Name of Insurance Company) | | | |
| **ACE American Insurance Company** | | | |

THE ONLY COMPANY APPLICABLE TO THIS POLICY IS THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**BANKERS STANDARD INSURANCE COMPANY** (A stock company)
**ACE AMERICAN INSURANCE COMPANY** (A stock company)
**ACE PROPERTY AND CASUALTY INSURANCE COMPANY** (A stock company)
**INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**PACIFIC EMPLOYERS INSURANCE COMPANY** (A stock company)
**ACE FIRE UNDERWRITERS INSURANCE COMPANY** (A stock company)
**WESTCHESTER FIRE INSURANCE COMPANY** (A stock company)

436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106-3703

BRANDON PEENE, Secretary        JOHN J. LUPICA, President

Authorized Representative

# EXHIBIT B



XL Insurance

**Binder**

| | |
|---|---|
| **DATE OF ISSUANCE** | July 11, 2024 |
| **EXPIRATION DATE OF THIS DOCUMENT** | All coverage under this binder shall cease upon issuance of the policy by the Company, but in no event later than 60 days from the issuance date. |
| **ISSUING COMPANY** | XL Insurance America, Inc. (admitted)<br>(hereinafter referred to as the Company) |
| **UNDERWRITING OFFICE** | 111 South Wacker Drive<br>Chicago, IL 60606<br>Emily Hernandez, CRIS<br>312 444 6566 |

| | | |
|---|---|---|
| **FINANCIAL RATING** | S&P: AA- | A.M. Best: A+ (Stable) |

| | |
|---|---|
| **Producer** | Marsh |
| **Attn** | Colin Cleary |
| **NAMED INSURED** | Sarasota Bayside, LLC |
| **MAILING ADDRESS** | 121 Alhambra Plaza PH1<br>Coral Gables, FL 33134 |

**ADDITIONAL INSURED(S)**
    As per Construction Risk Coverage Form ACE0728 (11/21). attached to this document.

**POLICY FORM**
    Construction Risk Coverage Form ACE0728 (11/21). attached to this document.

**POLICY NUMBER**                US00141193CA24A

| **POLICY TERM** | Inception Date: | June 17, 2024 |
|---|---|---|
| | Expiration Date: | May 17, 2026 |

**EXTENSION OF THE POLICY TERM**
    As per Construction Risk Coverage Form ACE0728 (11/21). attached to this document.

**INSURED PROJECT**
| | |
|---|---|
| Project Name and/or Contract Number: | Sarasota Bayside |
| Project Description: | New construction of a concrete masonry 5-story apartment building with an internal (wrap) 4-story parking garage totaling 139,972 SF. |
| Project Location: | 800 Cocoanut Avenue<br>Sarasota, FL 34236 |
| Approximate Latitude: | 27 3432 |
| Approximate Longitude: | -82 5445 |

**ESTIMATED INSURED VALUE**
| | |
|---|---|
| Property Damage: | $107,556,327 |
| Delay in Completion (12 months period of indemnity): | $19,473,969 |
| **Total** | **$127,030,296** |

**POLICY LIMIT**
    This policy covers the percentage interest indicated below in the insurance described herein.  The maximum amount the Company shall pay under this policy is limited to the Limit of Liability per "Occurrence" excess of Deductible(s) shown below, which is further limited by any applicable Sublimit(s) stated below or endorsed hereon.

    **$127,030,296**

**COMPANY PARTICIPATION**

The Company participates with other insurers to the extent of the Company's proportionate share of insurance as described below. Each of the insurance companies participating agrees to insure only for their respective percentage share of the designated layer(s) of the recoverable insured loss. The amount recoverable is determined and measured according to the terms and conditions of the Lead Policy and any Endorsements as may be attached hereto. The maximum amount that the Company shall pay is limited to the following participation shown below:

AXA XL Participation: **Quota Share - Follow**
AXA XL Percentage interest covered by this policy: **28.00%**
AXA XL Limit of Liability : **$35,568,483**

**SUBLIMITS OF LIABILITY**
As per Lead Carrier's Binder attached to this document.

**ANNUAL AGGREGATE LIMITS OF LIABILITY**
As per Lead Carrier's Binder attached to this document.

**DEDUCTIBLES**
As per Lead Carrier's Binder attached to this document.

**NOTICE OF TERRORISM INSURANCE COVERAGE**
You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury in accordance with the provisions of the federal Terrorism Insurance Act, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.
**Terrorism coverage until expiration of this Policy.**

**DEPOSIT PREMIUM**

| Coverage/Exposure | Insured Value | Coverage Period (months) | Term Rate per $100 of Insured Value | Gross Term Premium (100%) | Company Gross Term premium 28.00% |
|---|---|---|---|---|---|
| Insured Property | ▮ | ▮ | ▮ | ▮ | ▮ |
| Delay in Completion | ▮ | ▮ | ▮ | ▮ | ▮ |
| Certified Act(s) of Terrorism | ▮ | ▮ | ▮ | ▮ | ▮ |
| | | | Total Deposit Premium: | ▮ | ▮ |
| | | | Brokerage Commission of 15%: | | |
| | | | Fees & Other Charges**: | ▮ | ▮ |
| | | | Total Amount Due | ▮ | ▮ |

** all state fees and charges are in addition to the premium shown above.

**ANNUAL RATE (excluding Terrorism)**
As per Lead Carrier's Binder attached to this document.

**CANCELLATION**
As per Lead Carrier's Binder attached to this document.

**INSURED VALUE AND REPORTING**
As per Lead Carrier's Binder attached to this document.

**TERRITORY**
As per Lead Carrier's Binder attached to this document.

**TERMS, CONDITIONS, LIMITATIONS, SUBJECTIVITIES AND EXCLUSIONS**
The following terms, conditions, limitations, subjectivities and exclusions, if marked by "x", apply:

| | |
|---|---|
| x | Construction Risk Coverage Form ACE0728 (11/21), and endorsements. |
| x | Insurance is not effective until the Named Insured or producer receives written confirmation from the Company. |
| x | Subject to AXA XL's validation that the Insured meets the US Government requirements of OFAC compliance. |
| x | The premium is a deposit premium and shall be adjusted upon the extension, expiration or cancellation of the policy. |
| x | The premium is based on estimated insured value(s) mentioned above. |
| x | AXA XL premium of $135,394 due 6/17/2024 & AXA XL premium of $135,394 due 12/1/2024. |
| | |

**ATTACHMENTS / ENDORSEMENTS**
The following form(s) and endorsement(s), if marked by "x", attach to and form a part of this document:

| | |
|---|---|
| x | Communicable Disease Exclusion Endorsement |
| x | Construction Risk Coverage Form ACE0728 (11/21). and endorsements. |
| x | XL Insurance America  Inc. (admitted) Follow Form Builders Risk Insurance Policy Declarations and Coverage Terms |
| x | U.S. Treasury Department's Office of Foreign Assets Control "OFAC" |
| x | Certified Act(s) of Terrorism Addendum |
| x | MANUS Chubb ACE0729 (11-21) Amended Prevention of Access language |
| x | Governmental Action Limitation Endorsement |

**ADDITIONAL INFORMATION NEEDED (due within 30 days of binding).**
The following information, if marked by "x", is needed:

| | |
|---|---|
| x | Finalized budget with detailed Hard Cost breakdown |
| x | Confirm if any work has begun on the project site |

Thank you for the order to bind coverage. Please do not hesitate to let us know if you have questions or comments. We are looking forward to working with you.

NOTICE TO POLICYHOLDERS

**U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL**
**("OFAC")**

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1] . Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions embargoes or export controls applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions, embargoes or export controls law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC or the applicable regulator. Other limitations on the premiums and payments also apply.

---

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

PN CW 05 0519

©2019 X.L. America, Inc. All rights reserved. May not be copied without permission. Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**XL Insurance**

## Certified Act(s) of Terrorism Addendum

**Insured:**  Sarasota Bayside, LLC

**Term:**  6/17/2024 to  5/17/2026

This addendum details optional coverage for "Certified Acts of Terrorism" pursuant to The Terrorism Risk Insurance Program established by the Terrorism Risk Insurance Act of 2002.

The TRIA legislation requires the Company to offer coverage for "Certified Acts of Terrorism" which indemnifies the Insured (subject to the policy terms) in the event a loss has been Certified by the Secretary of Treasury in accordance with the provisions of the federal Terrorism Risk Insurance Act. This optional coverage is only available if purchased in conjunction with the builders risk coverage being offered by the Company.

Certified Acts of Terrorism coverage may be purchased subject to the following:

| Certified Acts of Terrorism - Premium & Limit | | | | | |
|---|---|---|---|---|---|
| | Limit per Occurrence | | 100% Premium for Certified Acts of Terrorism | Company Share | Gross Premium Due Company |
| $127,030,296 | xs of | Deductibles | ███ | | |
| Total Program Premium for TRIA: | | | ███ | | |
| The Company's share of the Total Certified Acts of Terrorism Premium: | | | | | ███ |
| | | | | | |

| Terrorism Limit provided by The Company: | |
|---|---|
| Certified Acts of Terrorism: | $35,568,483 |

If the insured purchases Certified Act(s) of Terrorism, then the Certified Act(s) of Terrorism Endorsement KBM 900 0120 will be attached to your policy.

## Certified Act(s) of Terrorism Endorsement    Form: KBM 900 0120

In consideration of an additional premium detailed below, with respect to insured locations in the United States, its territories and possessions and Puerto Rico, this policy is extended to insure Certified Act(s) of Terrorism. All other terms, conditions and exclusions of this policy including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this policy.

Notwithstanding anything to the contrary in this policy or any of its endorsements, there is no coverage provided for any costs or expenses associated with coverage provisions for sue and labor or protection and preservation of property, including but not limited to costs or expenses incurred for actions to defend, safeguard, preserve, protect or recover any covered property against actual, imminent or suspected terrorism.

Any loss or damage and resulting business interruption for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act, as amended, (all hereinafter, "TRIA"), are not insured under any circumstance by this coverage extension regardless whether caused by or resulting from an insured peril.

**Disclosure fo Federal Participation in Payment of Terrorism Loss**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program under a formula established by Federal Law.  Under the formula, the United States Government generally reimburses 80% from 2020 through 2027, of covered Terrorism losses exceeding the statutorily-established deductible paid by the Insurance Company providing the coverage.  However, if aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

Issued: 7/11/2024
Form: XL Catlin TRIA





**Certified Act(s) of Terrorism Addendum**

**Disclosure of Cap on Company Participation in Payment of Terrorism Losses**
TRIA contains a $100 billion cap that limits U.S. Government reimbursement.  If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a calendar year and the Company has met its deductible under TRIA, the Company shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Disclosure of Premium for Certified Act(s) of Terrorism Coverage**
"In accordance with the federal Terrorism Risk Insurance Act, we are required to disclose the portion of your premium attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The premium charged for Certified Act(s) of Terrorism is:

$7,887

**Definitions**
Wherever used in this policy or its endorsements a Certified Act of Terrorism means any act that is certified by the Secretary of the Treasury in accordance with the provisions of the federal Terrorism Risk Insurance Act.

**Termination**
The Terrorism Risk Insurance Act, as amended, was extended effective January 1, 2020 until December 31, 2027.  Coverage for "Certified Acts of Terrorism" will terminate on the policy effective December 31, 2027.  In the event the Program established by TRIA terminates prior to the expiration of this policy, coverage provided under this endorsement for "Certified Act of Terrorism" shall cease simultaneously. Should the Terrorism Risk Insurance Act be amended to extend beyond December 31, 2027, an additional premium will be charged for the time period from January 1, 2028 until the expiration of the policy.

All other terms, conditions, limitations and exclusions of this policy remain unchanged.

Issued: 7/11/2024
Form: XL Catlin TRIA

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m.,      forms a part of

Policy No.        issued to

by        .

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## COMMUNICABLE DISEASE EXCLUSION ENDORSEMENT

This endorsement modifies the policy identified above and is subject to all definitions in that policy.

The policy is amended to include the following:

Notwithstanding any provision to the contrary within this policy or any endorsement attached thereto, this policy does not insure any loss, damage, claim, cost, expense, or other sum of any nature directly or indirectly based upon, arising out of, attributed to, caused by, or relating to:

1.  any **Communicable Disease**;

2.  any fear or threat (whether actual or perceived) of any **Communicable Disease**; or

3.  any act, error, or omission in controlling, preventing, or suppressing, or failing to control, prevent, or suppress, or in any way relating to any outbreak of any **Communicable Disease**.

This exclusion applies regardless of any other cause or event contributing concurrently or in any other sequence with or to such loss, damage, claim, cost, expense, or other sum.

Any actual, alleged, threatened, perceived, or suspected presence or existence of any **Communicable Disease** at, on, in, affecting, impacting, or impairing any property, or preventing any use of any property, shall not constitute physical loss or damage.

With respect to this endorsement, the following definition is added:

**Communicable Disease** means any illness, sickness, disease, infection, condition, or disorder caused, in whole or in part, by any direct or indirect contact with or exposure to any virus, parasite, or bacteria or any disease-causing agent of any nature regardless of the method of transmission, contact or exposure.

All other terms and conditions remain unchanged.

**ENDORSEMENT #**

This endorsement, effective          12:01 a.m., forms a part of

**Policy No.**                      **issued to:**

**by**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.


**GENERAL CHANGE ENDORSEMENT**

**CONSTRUCTION COVERAGE FORM- ACE0729 (11/21)**


The **DELAY IN OPENING ENDORSEMENT**, **INSURING AGREEMENT**, Paragraphs 2 and 3 are amended to read as follows:

**2.   Civil Authority**
The Company will pay the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained as a result of a DELAY in completion of the INSURED PROJECT, caused by action of civil authority that prohibits access to the INSURED PROJECT site stated on the Policy Declarations due to direct physical LOSS to property, other than at the INSURED PROJECT site stated on the Policy Declarations, caused by or resulting from an insured peril. The direct physical LOSS to property must occur within five (5) miles of the INSURED PROJECT site.  This coverage will apply for a period of up to thirty (30) consecutive days after the application of the WAITING PERIOD.

**3.   Ingress / Egress**
The Company will pay the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained as a result of a DELAY in completion of the INSURED PROJECT, caused by an insured peril that prohibits access to the INSURED PROJECT site stated on the Policy Declarations due to direct physical LOSS to property, other than at the INSURED PROJECT site stated on the Policy Declarations. The direct physical LOSS to property must occur within five (5) miles of the INSURED PROJECT site.  This coverage will apply for a period of up to thirty (30) consecutive days after the application of the WAITING PERIOD.

© 2014 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m.,        forms a part of

Policy No.        issued to

by        .

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**GOVERNMENTAL ACTION LIMITATION ENDORSEMENT**

This endorsement modifies the policy identified above and is subject to all definitions in that policy.

The policy is amended to include the following:

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage, even if such other cause or event would otherwise be covered. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

**a. Governmental Action**

Seizure, confiscation, expropriation, nationalization or destruction of property by order of governmental authority.

This exclusion does not apply to seizure or destruction of property by order of governmental authority taken at the time of a fire to prevent its spread.

PROP510b

CHUBB®

| | | | |
|---|---|---|---|
| TO: | Colin Cleary | FROM: | Sarah Wigle |
| COMPANY: | Marsh USA Inc. | DATE SENT: | 07/10/2024 |
| EMAIL: | colin.cleary@marsh.com | EMAIL: | sarah.wigle@chubb.com |

**Builders Risk Coverage Binder – Revised**
Policy #: I11218350 001

Named Insured and Mailing Address: Sarasota Bayside, LLC
                                    121 Alhambra Plaza PH1, Coral Gables, FL 33134

Thank you for submitting the captioned account.   Please read this binder carefully, as the limits, coverage, exclusions, and any other terms and conditions may vary from those you requested in your submission and/or from the expiring policy.

This binder is valid for 60 days from the date sent.  Please contact me with any questions that you may have.

**When Coverage Begins:**    **06/17/2024** 12:01 A.M. Local Time at the NAMED INSURED's Address

**When Coverage Ends:**    **05/17/2026** 12:01 A.M. Local Time at the NAMED INSURED's Address

**Company:**    **ACE American Insurance Company (Admitted)**

**Coverage:**    Builder's Risk

**Coverage Form(s):**    Construction Risk Coverage Form ACE0728 (11/21)

**Covered Perils:**    Direct physical LOSS subject to the terms, conditions and exclusions in the policy forms and as specified below.

Whenever "NCP" is shown below it denotes no coverage has been purchased and no coverage is provided. Whenever "NA" is shown below it denotes "Not Applicable" to that coverage, deductible, Sub-limit of Insurance, or other policy provision.

**I. Description, Location and Estimated Completed Value of the INSURED PROJECT at Policy Inception**

   A.   Estimated construction contract price: $107,556,327

   B.   Value of all property not declared in A. above to be insured by this Policy and intended for installation under the construction contract, whether supplied by the INSURED PROJECT owner(s) or other(s): $0

   C.   Estimated COMPLETED VALUE of the INSURED PROJECT at Policy inception: $107,556,327

   D.   Value of EXISTING PROPERTY at Policy Inception: $0

   E.   INSURED PROJECT Name: Sarasota Bayside

   F.   INSURED PROJECT Description/Construction: New construction of a concrete masonry 5-story apartment building with an internal (wrap) 4-story parking garage totaling 139,972 SF.

   G.   INSURED PROJECT Site: 800 Cocoanut Avenue, Sarasota, FL 34236

**II. Limits of Insurance:**

   $63,515,148 (50%) part of $127,030,296 Per OCCURRENCE

The Company will pay no more for direct physical LOSS in any one OCCURRENCE than the above Limit of Insurance. In addition, the Company will not pay for more than its proportionate share (50%) of the following Sub-limits of Insurance and Annual Aggregate Sub-limits of Insurance, which are part of, and not in addition to, the Limit of Insurance above:

**Sub-limits of Insurance**

A.  Physical LOSS to the INSURED PROJECT          $107,556,327

B.  Delay in Opening (per Form Number ACE0729)      $19,473,969  per OCCURRENCE and in the Aggregate

|  | Maximum PERIOD OF INDEMNITY: | | |
|---|---|---|---|
| | Loss of RENTAL INCOME | 365 Calendar Days |
| | Loss of BUSINESS INCOME | NCP Calendar Days |
| | SOFT COSTS / ADDITIONAL EXPENSES | 365 Calendar Days |

Loss of RENTAL INCOME:        $7,864,311    Monthly Limit of Indemnity $655,359
Loss of BUSINESS INCOME:      $NCP         Monthly Limit of Indemnity $NA
SOFT COSTS/ADDITIONAL EXPENSES:  $11,609,658    Monthly Limit of Indemnity $NA

Interest Expense on CONSTRUCTION
LOAN(s);                      $6,400,000    Monthly Limit of Indemnity $NA

Advertising and promotional expense;    $63,000    Monthly Limit of Indemnity $NA

Legal and accounting fees;    $112,500    Monthly Limit of Indemnity $NA

Commissions incurred upon the
renegotiation of leases;      $NCP         Monthly Limit of Indemnity $NA

Fees for licenses and permits;    $198,175    Monthly Limit of Indemnity $NA

Insurance premiums for Builders Risk,
Workers' Compensation and General
Liability Insurance;          $1,203,947    Monthly Limit of Indemnity $NA

Real estate taxes and assessments;    $243,413    Monthly Limit of Indemnity $NA

Project administration expense, excluding
Developer fees and project resequencing
costs;                        $NCP         Monthly Limit of Indemnity $NA

Other: Architectural and Engineering Fees;    $820,101    Monthly Limit of Indemnity $NA

Other: Development Fee;       $974,210    Monthly Limit of Indemnity $NA

Other: Other Development Costs;    $435,193    Monthly Limit of Indemnity $NA

Other: Financing Fees;        $500,000    Monthly Limit of Indemnity $NA

Other: Contingency on the above
SOFT COSTS / ADDITIONAL EXPENSES;    $659,119    Monthly Limit of Indemnity $NA

C.  EXISTING PROPERTY         $NCP

D.  Damage to the Owner's EXISTING
    PROPERTY – Limited        $NCP

E.  Property in Transit per Conveyance    $5,000,000

F.  Temporary Off-site Storage and Off-site Staging
    Areas, any one location    $5,000,000

G.  Expediting and Extra Expenses    20% of the insured physical LOSS, or $2,500,000; whichever is less

H.  Debris Removal            25% of the insured physical LOSS, or $7,500,000; whichever is less

I.  Trees, Shrubs, Plants and Lawns    $1,000,000

J.  Protection Service Charges                                $100,000

K.  Fire Protective Equipment Recharge                        $100,000

L.  Valuable Papers and Records                               $1,000,000

M.  Claim Preparation Expenses                                $250,000

N.  Protection of Insured Property Pre-LOSS                   $100,000

O.  Architects and Engineers Fees                             $1,000,000

P.  Office and Construction Trailers/Semi-trailers
    and their Contents                                        $100,000

Q.  Ordinance or Law                                          $See ACE0769

R.  TESTING                                                   $Included

S.  Business Personal Property                                $Included

T.  Contract Penalty                                          $NCP

U.  TOWER CRANE Re-Erection Expense                           $50,000

V.  NAMED WINDSTORM                                           $25,000,000

**Annual Aggregate Sub-limits of Insurance**

A.  FLOOD                        Per OCCURRENCE      $15,000,000
                                 Annual Aggregate    $15,000,000

B.  EARTH MOVEMENT               Per OCCURRENCE      $127,030,296
                                 Annual Aggregate    $127,030,296

C.  Pollution or                 Per OCCURRENCE      $250,000
    Contamination Clean-Up        Annual Aggregate    $250,000

D.  Limited Coverage for         Per OCCURRENCE      $250,000
    FUNGUS, Wet Rot,
    Dry Rot or Bacteria          Annual Aggregate    $250,000


**III. Escalation Clause**

The Sub-limit of Insurance for Physical LOSS to the INSURED PROJECT stated above is considered an estimate.  Should any increase in the Estimated Completed Value of the INSURED PROJECT occur, the Sub- limit of Insurance for Physical LOSS to the INSURED PROJECT will automatically increase to reflect the change concurrently, subject to a maximum increase of 5% of the original Sub-limit of Insurance stated above. The Per OCCURRENCE Limit of Insurance stated above will increase by the same amount.

This clause does not apply to other Sub-limits of Insurance, including Delay in Opening, if endorsed to this Policy, nor does it apply to the Annual Aggregate Sub-limits of Insurance.


**IV. Deductibles**

$50,000          direct physical LOSS in any one OCCURRENCE except;

A.  LOSS in any one OCCURRENCE caused by
    or resulting from FLOOD                     $500,000 or 5 %
    Subject to a maximum deductible of:         $NA

B.  LOSS in any one OCCURRENCE caused by
or resulting from EARTH MOVEMENT            $<u>100,000</u> or <u>NA</u>%
Subject to a maximum deductible of:         $<u>NA</u>

C.  LOSS in any one OCCURRENCE caused by
Or resulting from WATER DAMAGE              $<u>See Terms & Conditions</u> or <u>NA</u>%
Subject to a maximum deductible of:         $<u>See Terms & Conditions</u>

D.  LOSS in any one OCCURRENCE caused by
or resulting from NAMED WINDSTORM           $<u>500,000</u> or <u>5</u>%
Subject to a maximum deductible of:         $<u>NA</u>

E.  LOSS in any one OCCURRENCE
caused by or resulting from TESTING         $<u>50,000</u> or <u>NA</u>%

F.  LOSS in any one OCCURRENCE caused by
or resulting from <u>NCP</u>                $<u>NA</u> or <u>NA</u>%

Where a percentage deductible is shown above, the deductible shall be the greater of the dollar amount shown, or the stated percentage of the total insured values at the INSURED PROJECT site or sites at the time and date of the LOSS, unless a maximum deductible is listed.

Delay in Opening – WAITING PERIOD:         <u>45</u> Calendar Days, Each DELAY
                                           except;

A.  Each DELAY caused by or
resulting from FLOOD:                      <u>45</u> Calendar Days

B.  Each DELAY caused by or
resulting from EARTH MOVEMENT:             <u>45</u> Calendar Days

C.  Each DELAY caused by or
resulting from NAMED WINDSTORM:            <u>45</u> Calendar Days

D.  Each DELAY caused by or resulting
from WATER DAMAGE:                         <u>45</u> Calendar Days

E.  Each DELAY caused by or resulting
from <u>NCP</u>:                           <u>NA</u> Calendar Days

## V. Rates and Adjustment

| Coverage Type | Rate | Annual Premium | Term Deposit Premium |
|---|---|---|---|
| INSURED PROJECT Physical LOSS | $<u>Various</u> Per $100 **Annual** | $<u>Various</u> | ███████ |
| Delay in Opening | $<u>Various</u> Per $100 **Annual** | $<u>Various</u> | ███████ |
| TESTING (<u>Included</u> days) | $<u>Included</u> Per $100 **Annual** | $<u>Included</u> | $<u>Included</u> |
| TESTING (<u>Included</u> days) Delay in Opening | $<u>Included</u> Per $100 **Annual** | $<u>Included</u> | $<u>Included</u> |

**Total Deposit Premium:** ███████
**TRIPRA Premium:** ███████
**Total Deposit Premium**
**Including TRIPRA:** ███████

Subject to a minimum earned premium of ███████

**For reference, the 100% Deposit Premium is**  **plus 3% TRIPRA.**

Estimated Taxes, Surcharges & Fees:

2023 Florida Emergency Assessment Surcharge ████████

Combined Total Amount Due including Taxes, Surcharges & Fees: $████████

Any applicable taxes, surcharges or fees, etc. are in addition to the above stated premium. The actual taxes, surcharges or fees, etc. will be those in effect on the date coverage is bound. The insured is responsible for paying these taxes, surcharges or fees in addition to the above stated premium.

**Commission:** <u>15</u>%

**Terms & Conditions:**

1. ACE0974 (04/20) Exclusion Of Loss Due To Virus, Bacteria Or Microorganism That Induce Physical Distress, Illness Or Disease will be attached to the policy. Sample language is attached.

2. ACE0975 (11/21)-Flood And Named Windstorm Definitions Endorsement will be attached to the policy. Sample language is attached.

3. ACE 1058 (04/22) Piling Works Exclusion Endorsement will be attached to the policy. Sample language is attached.

4. ACE 1057 (04/22) Exclusion – Loss, Damage or Expenses Arising From Water Below The Surface Of The Ground will be attached to the policy. Sample language is attached.

5. ACE0769 (10/15) – Ordinance Or Law Coverage Endorsement will be attached to the policy. Sample language is attached.

6. ACE0927 (03/22) 342474- Amendment To Excluded Causes Of Loss – Cost Of Making Good will be attached to the policy. Sample language is attached.

7. Manuscript Installment Payments Endorsement will be attached with the below; final wording to follow.
   Installment Due Date    Installment Premium
   06/17/2024    ████████
   12/01/2024    ████████

8. Section IV. Deductibles, item C. LOSS in any one OCCURRENCE caused by or resulting from WATER DAMAGE will be as follows:
   $250,000 for the first occurrence; and
   $500,000 for all subsequent occurrences.
   Final wording to be agreed.

**VI. Extension of Term:**

This Policy may be extended for a period not to exceed <u>sixty</u> (<u>60</u>) days from the original expiration date shown above, subject to the same terms and conditions in effect at the time of the extension, and subject to a pro-rata additional premium, exclusive of TESTING.

NOTE:  Premium rates applicable to coverage during the period of June 1st through November 30th (NAMED WINDSTORM Season) may differ from rates applicable during the period December 1st through May 31st, and additional premium for extensions will reflect those pricing differences.

The TESTING PERIOD may be extended for a period not to exceed <u>sixty</u> (<u>60</u>) days from the number of days for TESTING stated in V. Rates and Adjustment above, subject to the same terms and conditions in effect at the time of the extension, and subject to an additional premium based upon the number of days of the extension period.

The NAMED INSURED must request these extensions in writing and receive acceptance from the Company prior to the original expiration date of this Policy. If the NAMED INSURED does not provide the aforementioned written extension request(s), coverage provided hereunder shall terminate on the original expiration date stated in this Policy.

**VII. Additional NAMED INSURED Information:** <u>None</u>

**VIII. Mortgagee and Loss Payee Information:** <u>None</u>

**Valuation:**

At the time and place of direct physical LOSS, the basis of adjustment of a claim, unless otherwise endorsed herein, shall be as follows:

A.  Property Under Construction – The cost to repair or replace the insured property lost or damaged with material of like kind and quality, less betterment, including contractor's reasonable profit and overhead not exceeding the percentages in the original contract. If the insured property is not repaired or replaced, then direct physical LOSS shall be settled on the basis of ACTUAL CASH VALUE.

B.  EXISTING PROPERTY - The Company will pay the least of the following for direct physical LOSS to EXISTING PROPERTY:

   1.  The ACTUAL CASH VALUE of the EXISTING PROPERTY;
   2.  The cost of reasonably restoring the EXISTING PROPERTY to its condition immediately prior to the direct physical LOSS;
   3.  The cost of replacing the EXISTING PROPERTY with substantially identical property unless replacement with substantially identical property is impossible or unnecessary.  In such case, FUNCTIONAL REPLACEMENT COST would apply.

C.  Property of Others (Including Items Supplied by the Owner) – If Property of Others is new, the cost to repair or replace the insured property lost or damaged with material of like kind and quality, less betterment.  If Property of Others is not new then, the Owner's cost or ACTUAL CASH VALUE, whichever is less.

   If the Property of Others is not repaired or replaced, then direct physical LOSS shall be settled on the basis of ACTUAL CASH VALUE.

D.  TEMPORARY STRUCTURES – The cost to repair or replace the insured property lost or damaged with material of like kind, quality, and condition but in the event the insured property is not repaired or replaced recovery will not exceed the ACTUAL CASH VALUE.

E.  Valuable Papers and Records - The cost to reproduce the insured property with other property of like kind and quality including the cost of gathering or assembling information from back up data if replaced, or if not replaced, at the value of blank material.

F.  ELECTRONIC MEDIA or ELECTRONIC DATA - The cost of the blank media, plus the costs of copying or restoring ELECTRONIC DATA from back-up or from originals of a previous generation, not including research and engineering or the costs or expense of recreating, gathering, or assembling such ELECTRONIC DATA.

   This Policy does not insure any amount pertaining to the value of such ELECTRONIC DATA to the Named Insured or any other party, even if such ELECTRONIC DATA cannot be recreated, gathered, or assembled.  If not repaired, replaced, or restored, ELECTRONIC MEDIA shall be valued at the cost of the blank media.

G.  Trees, Shrubs, Plants and Lawns - The cost to replace with property of like kind and quality plus the proper proportion of labor expended if such damage occurs after installation.

H.  Office and Construction Trailers/Semi-trailers and their Contents – If not more than 5 years old as of the expiration date of this Policy, based on the manufacturer's model year, and the NAMED INSURED repairs or replaces the insured property, the least of the following shall apply:

   1.  The cost to replace the lost or damaged insured property, without deduction for depreciation, with new property of comparable quality and utility;
   2.  The amount the NAMED INSURED spends to repair or replace the lost or damaged insured property.

If the insured property is more than 5 years old or the NAMED INSURED does not actually repair or replace the insured property within a reasonable period of time after the date of direct physical LOSS, the Company will pay the ACTUAL CASH VALUE.

The Company will pay for direct physical LOSS to insured property by determining its REPLACEMENT COST, provided that the NAMED INSURED actually repairs or replaces the lost or damaged insured property, or begins to repair the damaged insured property, within 24 months from the date of direct physical LOSS; otherwise, the Company will pay for direct physical LOSS to insured property by determining its ACTUAL CASH VALUE.

**Mandatory Exclusions & Amendments:**

All policy form exclusions including but not limited to Asbestos; Contaminants or Pollutants; Electronic Data/Cyber Risk, Fungus, Wet Rot, Dry Rot or Bacteria; Nuclear, Biological, Chemical, Radiological; and Virus/Bacteria Exclusions.

**Remarks:**

The terms, conditions, limits and exclusions of this binder supersede the submitted information and specifications submitted to us for consideration, and all prior quotations.

Actual coverage will be determined by and in accordance with the policy as issued by the insurer.

The insurer is not bound by any statements made in the submission purporting to bind the insurer unless such statement is in the actual policy.

This binder has been constructed in reliance on the information and specifications provided in the submission. A material change or misrepresentation of the submission information and specifications may void this binder.

**TRIPRA:**

ATTACHED PLEASE FIND A DISCLOSURE NOTICE REQUIRED BY THE TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION ACT ("TRIPRA").

**Certificates of Insurance:**

Please be advised that we do not review Certificates of Insurance or Evidences of Commercial Property Insurance issued by you, or by any party, relating to this policy of insurance either for content or accuracy. Accordingly, we request that you do not provide copies of certificates or evidences to us for review or for our records. Authority is granted to you for the limited purpose of issuing **unmodified ACORD Certificates (ACORD 25-S for Casualty and ACORD 24 for Property and Inland Marine) and unmodified Evidence of Commercial Property Insurance (ACORD 27 and 28) only.** It is your responsibility to see that any Certificate or Evidence provides an accurate representation of the coverage form and endorsements applicable to this policy at the time the Certificates or Evidences is issued. **Any modification of the approved ACORD forms specifically set forth above, or the issuance of a non-approved Certificates of Insurance ACORD or other is prohibited.** Certificates of Insurance or Evidence of Commercial Property Insurance may only be issued as a matter of information. You have no authority by virtue of a Certificate, Evidence, or otherwise, to amend, extend or otherwise alter coverage afforded under this policy. Certificates of Insurance or Evidences of Commercial Property Insurance are never recognized as endorsements or policy change requests. You must submit a separate written request if an endorsement or policy change (including but not limited to adding additional insureds, loss payees and mortgagees and/or alteration of notice requirements for cancellation) is requested. In the event a policy change is requested, the underwriter will advise if the request is acceptable to the Company.

**Thank you for the opportunity to work on this risk.**

**Best Regards,**

**Sarah Wigle**



## EXCLUSION OF LOSS DUE TO VIRUS, BACTERIA OR MICROORGANISM THAT INDUCE PHYSICAL DISTRESS, ILLNESS OR DISEASE

| Named Insured | Endorsement Number |
|---|---|
| | |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| | | | |

| Issued By (Name of Insurance Company) |
|---|
| |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

### CONSTRUCTION RISK COVERAGE FORM

### HOMEBUILDERS XTRA COVERAGE FORM

The following exclusion is added to this Policy; supersedes any term, provision or endorsement to the contrary in this Policy; and applies notwithstanding such term, provision or endorsement:

This Policy excludes any and all LOSS, damage, cost, or expense of any nature whatsoever directly or indirectly caused by or resulting from the following, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence thereto:

Any virus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease, or the fear or threat (whether actual or perceived) of any such virus, bacteria or microorganism, including any and all LOSS directly or indirectly caused by any action or inaction of the Insured or any action or order of a government undertaken in response to, or intended to detect, control, prevent, suppress, mitigate or remediate, the actual, suspected, or anticipated presence of any virus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease.

This exclusion does not apply to LOSS or damage caused by or resulting from moss or FUNGUS (including mold and mildew), or any mycotoxins, spores, scents, or other by-products of fungi, if such LOSS or damage, including any exclusion thereof, is addressed in a separate provision elsewhere in this Policy.

This exclusion supersedes any exclusion relating to CONTAMINANTS OR POLLUTANTS.

Other Policy provisions excluding coverage of loss due to virus, bacteria, or microorganism of a type other than that which induce or are capable of inducing physical distress, illness or disease remain in full force and effect.

All other terms and conditions remain unchanged.

# CHUBB®

## FLOOD AND NAMED WINDSTORM DEFINITIONS ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### CONSTRUCTION RISK COVERAGE FORM

It is agreed that **PART F DEFINTIONS** is amended as follows:

a.   Items 10. FLOOD and 17. NAMED WINDSTORM are deleted and replaced by the following:

10.   FLOOD

A general and temporary condition during which the surface of normally dry land is partially or completely inundated due to:

A.   Rain and resultant runoff; or

B.   The rising, overflow or breach of any boundary of a natural or man-made body of water; or

C.   Sea waves, tide or tidal waters, storm surge, or spray from any of these, whether driven by wind or not; however, FLOOD does not include tsunami, sea waves, tide or tidal waters, storm surge, or spray caused by or resulting from tectonic or seismic activity; or

D.   The failure of a cofferdam or similar structure intended to hold water back from an area of construction; or

E.   Unexpected accumulation of water caused by subsurface seepage or subsurface leakage.

As respects piles and other insured property designed to be used in or above water and purposely placed or stationed in or above lakes, rivers, streams, harbors or other bodies of water, any direct physical LOSS that could be deemed direct physical LOSS caused by WATER DAMAGE or direct physical LOSS caused by FLOOD under this policy, shall be deemed LOSS caused by FLOOD, and all terms and conditions herein shall apply as if the direct physical LOSS were caused by FLOOD.

FLOOD also means accumulation of water, including water that is mixed with soil, sand, rock, or other matter, in an excavation, pit or underground tunnel, shaft or pipe, or otherwise impacting construction work below grade.

FLOOD does not include NAMED WINDSTORM FLOOD.

17.   NAMED WINDSTORM

An intense tropical weather system with a well-defined circulation and maximum sustained winds of at least 39 mph or 63 km/hr that is named by the National Oceanic and Atmospheric Administration (NOAA), including any of NOAA's organizations, such as the National Weather Service or the National Hurricane Center.  NAMED WINDSTORM includes any tornadoes, microbursts or other wind event that is caused by or results from the NAMED WINDSTORM.

NAMED WINDSTORM includes NAMED WINDSTORM FLOOD.

CHUBB®

b.  The following is added:

    26.  NAMED WINDSTORM FLOOD

        FLOOD directly caused by or resulting from a NAMED WINDSTORM.

All other terms and conditions remain unchanged.

**CHUBB**®

# ORDINANCE OR LAW COVERAGE ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**CONSTRUCTION RISK COVERAGE FORM**

**PART C EXTENSIONS OF COVERAGE**, Item 15 is deleted in its entirety and replaced by the following:

15.  Ordinance or Law

If the repair of direct physical LOSS to insured property caused by an insured peril becomes subject to the enforcement of any ordinance or law that is in force at the time of direct physical LOSS and that:

A.  Requires the demolition of parts of the undamaged insured property; or

B.  Regulates the construction or repair of damaged insured property;

then the Company will pay up to the Sub-limits of Insurance stated below for:

COVERAGE 1:  The value of such undamaged part of the insured property which must be demolished;

COVERAGE 2:  The cost of demolishing the undamaged insured property and clearing the site of debris from such demolition;

COVERAGE 3:  The increased cost of repair and/or reconstruction of the damaged and undamaged insured property on the same site and limited to the minimum requirements of such ordinance or law regulating the repair or reconstruction of the damaged insured property on the same site.  However, the Company will not pay for any increased cost of repair or reconstruction unless the damaged insured property is actually rebuilt or replaced.

The Company will not pay the following costs:

i.  Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating asbestos or other hazardous material;

ii.  Cost of any governmental direction or request declaring that asbestos or other hazardous material present in, part of or utilized on any damaged or undamaged portion of insured property that can no longer be used for the purpose for which it was intended or installed and must be removed, modified or abated.

ACE0769 (10/15)

CHUBB®

iii.   Cost of demolition or increased cost of repair or reconstruction, debris removal, or other consequential loss caused by the enforcement of any ordinance or law regulating CONTAMINANTS OR POLLUTANTS; or

iv.   Cost of compliance with the enforcement of any ordinance or law which the NAMED INSURED or owner would have otherwise been required to comply by nature of such ordinance or law in the absence of any direct physical LOSS covered by this Policy.

**Sub-limits of Insurance**

These Sub-limits of Insurance are part of and not in addition to the Limit of Insurance per OCCURRENCE stated on the Declarations.

COVERAGE 1.          $107,556,327

COVERAGE 2.          $10,000,000

COVERAGE 3.          $10,000,000

All Ordinance or Law Coverages in any one OCCURRENCE $107,556,327

All other terms and conditions remain unchanged.

ACE0769 (10/15)



## AMENDMENT TO EXCLUDED CAUSES OF LOSS - COST OF MAKING GOOD

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period        to | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### CONSTRUCTION RISK COVERAGE FORM

**PART D EXCLUSIONS**, Excluded Causes of LOSS, subpart **III. Cost of Making Good** is deleted in its entirety and replaced by the following:

### III. Cost of Making Good:

This Policy does not insure the costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the LOSS:

A.   Fault, defect, error, deficiency or omission in design, plans, specifications, engineering or surveying;

B.   Faulty or defective workmanship, supplies or material;

However, if direct physical LOSS by an insured peril ensues, then this Policy will provide cover for such ensuing LOSS to insured property, including the damaged insured property that was faulty or defective. However, under no circumstances will this policy cover the costs to improve or redesign the original design, plans, specifications, engineering, surveying, workmanship, supplies or material.

For the purpose of this Policy and not merely this Excluded Cause of LOSS, insured property, or any portion thereof, shall not be regarded as damaged solely by virtue of the existence of any condition stated under A. or B. above.

The deductible applicable to this endorsement is $250,000 per OCCURRENCE.

The premium charge for this endorsement is $Included which is included in the premium stated on the Declarations.

All other terms and conditions remain unchanged.

_____
Authorized Representative

ACE0927 (03/22)
342474

# CHUBB®

Sarasota Bayside, LLC
Policyholder

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended, the definition of act of terrorism has changed.  As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury---in consultation with the Secretary of Homeland Security, and the Attorney General of the United States---to be an act of terrorism; to be a  violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of  certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.  Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended.  However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events.  Under the formula, the United States Government generally reimburses 80% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.


The portion of your term premium that is attributable to coverage for acts of terrorism is_$14,084__ and does not include any charges for the portion of losses covered by the United States government under the Act.

TR-45231a (08/20)

IL 09 52 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

# EXHIBIT C

# ★ OLD REPUBLIC INLAND MARINE

307 N. Michigan Avenue
Chicago, IL 60601

**Date of Invoice:  06/11/2024**
**Invoice Number: TBD**

# INVOICE

Mail To

Marsh
1221 Brickell Ave
Miami, FL 33131

Insured: Sarasota Bayside LLC

Policy Number: IM 0000976 - 00
Effective Date: 06/17/2024
Expiration Date: 05/17/2026

Agent: Matthew Tahbaz
Agency Number: 208001

**Payment Due By:    07/17/2024**

| Transaction Description | Bill Type | Gross Amount | Commission % | Amount |
|---|---|---|---|---|
| Policy Premium | Agency | ████ | | ████ |
| Commission Payable | Agency | ████ | 15.00% | ████ |
| **Total Due** | | | | ████ |

Detach along the perforation below - Keep this part for your records
RETURN THIS PORTION WITH YOUR REMITTANCE

X

⑆06⑈11⑈2024⑉ I⑈T,⑈

**Mail Payment To:**
Old Republic Inland Marine
PO Box 778719
Chicago, IL 60677-8719

**Make Checks Payable To:** Old Republic Inland Marine

**Send Electronic Payment To:**
PNC Bank
Pittsburg PA 15219
Routing Number: 043000096
Account Number: 1082059018

**Due Date:** 07/17/2024
**Invoice Number:** TBD
**Invoice Date:** 06/11/2024
**Policy Number:** IM 0000976 - 00
**Amount Due:** ████
**Insured:** Sarasota Bayside LLC
**Agency Name:** Marsh

**Email Remittance or Questions To:** orimbilling@pmagroup.com

# ★ OLD REPUBLIC INLAND MARINE

**BINDER**

**POLICY NUMBER:** IM 0000976

**FROM - POLICY PERIOD - TO**

**06/17/2024 - 05/17/2026**

**SERVICING COMPANY NAME AND ADDRESS**
Old Republic Inland Marine
307 N Michigan Ave
Chicago, IL 60609
(844) 834-9716

**INSURED NAME AND ADDRESS**
Sarasota Bayside LLC
121 Alhambra Plaza PH1
Coral Gables,  FL 33134

**AGENCY NUMBER**
208001

**AGENCY NAME AND ADDRESS**
Marsh
1221 Brickell Ave
Miami, FL 33131

**COVERAGE WOULD BE PROVIDED BY**
Old Republic Union Insurance Company
307 N. Michigan Avenue
Chicago, IL 60601
(312) 346-8100

Date: 6/11/2024

Old Republic Inland Marine, Inc. (ORIM) is pleased to provide the insurance as stated in this binder. This binder which remains valid for 30 days from the date it is issued.  The policy will be issued and delivered in due course. This binder is based on the information provided to ORIM and is subject to the subjectivities noted below, if any.

Please check the offered terms and conditions carefully as they may differ substantially from what was requested on the application or otherwise.

Best regards,

Ben Golden
Assistant Vice President
P: 312-762-4104
E: bgolden@oldrepublicinlandmarine.com
www.oldrepublicinlandmarine.com

ORIM BR Q1 10 21

Print date: 6/11/2024

**BINDER**

**FOLLOW FORM BUILDERS RISK COVERAGE**

Lead Company

| | | |
|---|---|---|
| 1 | ACE American Insurance Company | Lead Company |
| 2 | Construction Risk Coverage Form ACE0728 (11/21) - Policy #: I11218350 001 | Lead Company Form |
| 3 | 05/30/2024 | Lead Company Quote Date |

Insured Project

| | | |
|---|---|---|
| 1 | Sarasota Bayside LLC | Project Name |
| 2 | New construction of a concrete masonry 5-story apartment building with an internal (wrap) 4-story parking garage totaling 139,972 SF. | Description of the Insured Project |
| 3 | 800 Cocoanut Avenue<br>Sarasota, FL 34236 | Project Location / Construction Site |
| 4 | $127,030,296 | Estimated **Total Project Value** |

ORIM BR Q1 10 21

Print date: 6/11/2024

**BINDER**

Limits of Liability

1    Maximum **Policy** Limit of Liability

    a    The maximum liability of the **Company** for all coverage provided under this **Policy** shall not exceed

        | $127,030,296 |    Per **Occurrence**.

    b    The **Company's** liability is also further limited by the limits, sub-limits and other terms and conditions of this **Policy**.

2    Coverage Limits of Liability

    a    | $107,556,327 |    Physical Damage    Per **Occurrence**

    b    | $19,473,969 |    Delay in Completion and    Per **Occurrence** and in the **Term Aggregate**
                                   Continuing Expenses

The amount of insurance provided by this **Policy** shall not be reduced by loss payment or settlement except for limits or sub-limits where an **Annual Aggregate** or **Term Aggregate** applies.

3    Combined Sub-limits of Liability

The following sub-limits apply on a combined basis for both Physical Damage and Delay in Completion and **Continuing Expenses**.  These sub-limits are a part of and not in addition to the Maximum **Policy** Limit of Liability.

    a    | $127,030,296 |    **Earth Movement**    Per **Occurrence** and in the **Annual Aggregate**
    b    | $15,000,000 |    **Flood**    Per **Occurrence** and in the **Annual Aggregate**
    c    | $25,000,000 |    **Named Storm**    Per **Occurrence**

4    Physical Damage Coverage Extensions

Per Lead Company Quote.

5    Delay in Completion and **Continuing Expenses** Sub-limits

The sub-limits below (a and b) apply per **Occurrence** and are a part of and not in addition to the Delay in Completion and **Continuing Expenses** Coverage Limit of Liability.

    a    | $7,864,311 |    Delay in Completion



The sub-limits below apply per **Occurrence** and are a part of and not in addition to the Delay in Completion sub-limit.

        i    | Not Covered |    **Loss of Gross Income**
        ii    | $7,864,311 |    **Loss of Rental Income**

    b    | $11,609,658 |    **Continuing Expenses**

**BINDER**

Deductibles

The Insured's retained liability for each separately adjusted loss shall be the amount stated below per **Occurrence**.

1    Physical Damage

| | | |
|---|---|---|
| a | $50,000 | All Other Perils |
| b | $100,000 | **Earth Movement** |
| c | 5% VARTOL / Min $500,000 | **Flood** |
| d | 5% VARTOL / Min $500,000 | **Named Storm** |
| e | $250,000 | **Water Damage** |

2    Delay in Completion and **Continuing Expenses**

a    **Scheduled Date of Completion** and Period of Indemnity

| | | |
|---|---|---|
| i | 05/17/2026 | **Scheduled Date of Completion** |
| ii | 12 Months | **Period of Indemnity** for Delay in Completion |
| iii | 12 Months | **Period of Indemnity** for **Continuing Expenses** |

b    Deductibles for Delay in Completion and **Continuing Expenses**

| | | |
|---|---|---|
| i | 45 Days | Delay in Completion |
| ii | 45 Days | **Continuing Expenses** |
| iii | 45 Days | **Earth Movement** |
| iv | 45 Days | **Flood** |
| v | 45 Days | **Named Storm** |
| vi | 45 Days | **Water Damage** |
| vii | 45 Days | **Wind** |

ORIM BR Q1 10 21

Print date: 6/11/2024

**BINDER**

**ADDITIONAL COVERAGE ENDORSEMENTS - To be added to the policy at issuance.**

**Protective Safeguards**

☑ The Construction Site must be surrounded by sufficiently strong fencing with locking gates both with a minimum height of six (6) feet.

☑ The entire Construction Site must be illuminated by sufficient nighttime lighting during all hours of darkness.

☐ [    ] Or more professionally sourced security guard(s), employed exclusively to work at the Construction Site shall always be on duty at the Construction Site when construction is not being performed.

☐ The Construction Site must be monitored at all times by an established provider of Internet based surveillance approved by the Company.

☐ Water and/or automatic sprinkler pipes must be adequately insulated or otherwise winterized to prevent freezing regardless of whether the pipes and/or automatic sprinklers are in use.

☐ Temporary heating and cooling measures sufficient to prevent damage from freezing or overheating must be maintained.

☐ Water and/or automatic sprinkler pipes must be monitored by automatic water flow alarms and automatic water leak detection systems by an established provider of such services approved by the Company.

ORIM BR Q1 10 21

Print date: 6/11/2024

**BINDER**

**COMPANY'S PARTICIPATION**

| | |
|---|---|
| 22% | Is the **Company's** Percentage of Participation part of 100% of the Limits and Sub-limits of liability provided by this **Policy** |
| $27,946,665 | Is the maximum for any one loss or **Occurrence** and including the same proportion of associated expenses |

**BUILDERS RISK RATES AND PREMIUMS**

| | PREMIUM |
|---|---|
| Physical Damage Term Rate (per $100) | ■ |
| Physical Damage Term Premium | ■ |
| Delay in Completion Term Rate (per $100) | ■ |
| Delay in Completion Term Premium | ■ |
| Continuing Expenses Term Rate (per $100) | ■ |
| Continuing Expenses Term Premium | ■ |
| Total Premium | ■ |
| **Company's** Premium | ■ |
| Terrorism Premium | ■ |
| Fire Following Terrorism Premium    (Also applies when Terrorism is declined) | ■ |
| State Surcharges and Fees | ■ |
| Risk Engineering or Loss Control Fees | ■ |
| Final Amount Due to the **Company** | ■ |
| The **Company's** Minimum Premium | ■ |

**Commission:** ■

The Physical Damage premium is a deposit based on the estimated **Total Project Value** and the initial Physical Damage Term Rate.  At the expiration of the **Policy**, the Insured will provide the **Company** with the final **Total Project Value** which will be used to determine the final Physical Damage premium.  The resulting additional or return premium shall then be paid by the First Name Insured or the **Company** to the other party as required, subject to the **Company's** minimum premium above.

**BINDER**

**BINDER SUBJECTIVITIES** - All subjectivities are due within 30 days.

- Review and approval of the lead carrier's form and endorsements.
- Water Mitigation Plan
- Project Schedule / Timeline schedule / GANT Chart that substantiates the project term
- Confirmation of compliance with geotechnical recommendations
- Budget – need formal GMP budget breaking down the $94,368,941 and to make sure general conditions/etc. and CM fees are included
- Security – confirmation site is fenced, locked and lit
- Final finished floor elevation of floor 1 / ground level
- Loss of Rents pro-forma mirroring the $7,864,311 quoted
- There looks to be some potential architectural woodwork/etc. when reviewing the renderings, to understand all wood and wood products within the facility (exterior/interior) in conjunction with final review of the formal budget (carpentry / woodwork / etc.)
- If work has begun - approx. value and scope of what has been completed to date

**NOTES**

- Cost of making good extension premium is included within the ▆▆▆▆▆ (TRIA in addition as noted)
- Section IV. Deductibles, item C. LOSS in any one OCCURRENCE caused by or resulting from **WATER DAMAGE** will be as follows:

  $250,000 for the first occurrence; and $500,000 for all subsequent occurrences.

- ACE0927 (03/22) 342474- Amendment To Excluded Causes Of Loss – Cost Of Making Good will be attached to the policy.
- The deductible applicable to this endorsement is $250,000 per OCCURRENCE.

**BINDER**

**FORMS & ENDORSEMENT SCHEDULE**

Forms and Endorsements applying to this Coverage Part and made a part of this policy at this time of issue:

### COMMON POLICY FORMS AND ENDORSEMENTS

| Form Number | Edition Date | Form Title |
|---|---|---|
| IL 09 52 | 01/01/2015 | Caps on Losses from Certified Acts of Terrorism - IL 09 52 |
| IL 09 85 | 12/01/2020 | Disclosure Pursuant To Terrorism Risk Insurance Act - IL 09 85 |
| IL P 001 | 01/01/2004 | U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders - IL P 001 |
| J-05 | 11/01/2021 | Commercial Policy Jacket - J-05 |
| ORIM C 01 | 01/01/2022 | How To Report a Claim - ORIM C 01 |
| ORU SIG | 12/01/2017 | Signature Page - ORU SIG |
| ORU SL 00 85 | 04/01/2021 | Florida Surplus Lines Notice (Guaranty Act) - ORU SL 00 85 |
| ORU SL 00 86 | 04/01/2021 | Florida Surplus Lines Notice (Rates And Forms) - ORU SL 00 86 |
| ORU SL 01 31 | 04/01/2021 | Service of Suit Endorsement - ORU SL 01 31 |
| PIM CD 01 | 09/01/2021 | Common Policy Declarations - PIM CD 01 |

### INLAND MARINE FORMS AND ENDORSEMENTS

| Form Number | Edition Date | Form Title |
|---|---|---|
| PIM 49 66 | 09/01/2021 | Protective Safeguards - PIM 49 66 |
| PIM 51 08 | 04/01/2023 | Cyber Exclusion - PIM 51 08 |